No. 23-1351

In the
United States Court of Appeals
for the Fourth Circuit

MARYLAND SHALL ISSUE, *et al.*,
*Plaintiffs-Appellants*

v.

ANNE ARUNDEL COUNTY, MARYLAND, *et al.*,
*Defendant-Appellee*

On Appeal from the United States District Court
for the District of Maryland

**BRIEF OF APPELLANTS**

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd., Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671

# DISCLOSURE STATEMENT

# TABLE OF CONTENTS

DECLOSURE STATEMENT ................................................................... i

TABLE OF CONTENTS …………………………………………………..ii

TABLE OF AUTHORITIES ................................................................ iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................2

STATEMENT OF THE CASE..................................................................2

   A.   Anne Arundel County Bill 108-21 ...........................................2

   B.   Statement of Facts …………………………………………….3

   C.   The District Court's Decision...................................................7

SUMMARY OF ARGUMENT ...............................................................9

ARGUMENT ..................................................................................12

I.      STANDARD OF REVIEW ....................................................12

II.     THIS CASE IS CONTROLLED BY *NIFLA*, NOT *ZAUDERER* .............13

   A.  First Principles.......................................................................13

   B.  *Zauderer* Was Sharply Limited By *NIFLA* ..................................16

   C.  The District Court Misapplied *NIFLA*........................................19

1. The *NIFLA* standard and the district court's ruling ...............................19

2. The district court misapplied *NIFLA* and *Zauderer*................................20

3. The district court's ruling is contrary to *Recht* ........................................28

4. The County's literature is not a "product warning"................................30

5. The district court's other errors ...............................................................32

D. The Literature  Is Not Purely Factual and Uncontroversial.........................36

1. The literature is not "purely factual"......................................................36

2. The literature is not uncontroversial .......................................................42

III. THE EXCLUSION OF PROF. KLECK'S EXPERT REPORT AND TESTIMONY WAS ERROR ……………………………………………  47

IV. THE DISTRICT COURT ERRED IN FAILING TO GRANT SUMMARY JUDGMENT FOR PLAINTIFFS ……………………………………  51

CONCLUSION ................................................................................................52

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*,
  191 F.3d 429 (4th Cir. 1999) ............................................................25

*American Beverage Assn. v. City and County of San Francisco*,
  916 F.3d 749 (9th Cir. 2019) ............................................................39

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)...........................49

*Ballengee v. CBS Broad., Inc.*, 968 F.3d 344 (4th Cir. 2020). ...............12

*Bolger v. Youngs Drug Prod. Corp.,* 463 U.S. 60 (1983). ......................26

*Brown v. Entertainment Merchants Ass'n.,* 564 U.S. 786 (2011) ...........41

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,* 142 S.Ct. 1464 (2022) ......19

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..............................32

*Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City
  Council Of Baltimore*, 879 F.3d 101 (4th Cir.), *cert. denied*, 138 S.Ct. 2710
  (2018), ........................................................... 15, 22, 24-28, 34, 36, 44

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*,
  515 U.S. 557 (1995)...................................................... 14, 17, 24, 34

*In re Bair Hugger Forced Air Warming Devices Products Liability Litigation*,
  9 F.4th 768 (8th Cir. 2021) ..............................................................50

*In re Lipitor*, 892 F.3d 624, 632 (4th Cir. 2018 ............................. 12, 48

*Jacobs v. N.C. Admin. Off. of the Cts*., 780 F.3d 562 (4th Cir. 2015). ...................50

*Janus v. American Fed. of State, Co. and Mun. Employees, Council 31*,
  138 S.Ct. 2448 (2018)................................................... 13, 15, 44, 46

*Lovell v. Griffin*, 303 U.S. 444 (1938). ...................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986) .............37

*MSI v. Hogan,* 971 F.3d 199 (4th Cir. 2020). .........................................32

*Nat'l Inst. of Fam.& Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018). .......... *passim*

*Nease v. Ford Motor Co*., 848 F.3d 219 (4th Cir. 2017). ........................................48

*NYSRA v. Bruen,* 142 S.Ct. 2111 (2022) ................................................32

*Oglesby v. General Motors Corp*., 190 F.3d 244 (4th Cir. 1999). .................. 15, 50

*Pacific Gas & Electric Co. v. Public Utilities Com'n.,* 475 U.S. 1 (1986). ............14

*Recht v. Morrisey,* 32 F.4th 398 (4th Cir. 2022)........................ 17, 18, 26, 28-29, 30

*Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155 (2015)................................................19

*Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133 (2000)......................49

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc*., 487 U.S. 781 (1988). ....13-15, 34-35

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
   547 U.S. 47 (2006)...........................................................................13

*South Carolina v. Baker,* 485 U.S. 505 (1988).........................................................33

*Summerlin v. Edgar,* 809 F.2d 1034 (4th Cir. 1987) ...............................................49

*Tolan v. Cotton,* 572 U.S. 650 (2014 ............................................................. 12, 49

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) .......................................51

*United States v. McDaniel,* 398 F.3d 540 (6th Cir. 2005). .....................................48

*United States v. Valencia*, 600 F.3d 389 (5th Cir.), *cert. denied,*
   562 U.S. 893 (2010)................................................................................41

*Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292 (4th Cir. 2017) ...............................41

*Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council Inc.*,
    425 U.S. 748 (1976) ............................................................................13

*Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019) ................................15

*West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624(1943). .....................................13

*Westfarm Associates Ltd. Partnership v. Washington Suburban Sanitary Com'n,*
    66 F.3d 669 (4th Cir. 1995) ...............................................................12

*Wooley v. Maynard*, 430 U.S. 705 (1977). .............................................................14

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
    471 U.S. 626 (1985), ................................................................... *passim*

**Statutes**

15 U.S.C. §§ 1261-1278 ...........................................................................30
28 U.S.C. § 1291 ...................................................................................2, 9
28 U.S.C. § 1331 .......................................................................................1
28 U.S.C. § 1343 .......................................................................................1
Child Safety Protection Act, Pub.L. No. 103–267, 108 Stat. 722 (1994) ..............30
Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(a),(d) ............................30

**Regulations**

21 C.F.R. § 314.105(b). ...........................................................................30

# In the
# United States Court of Appeals
# for the Fourth Circuit

---

**MARYLAND SHALL ISSUE**, *et al.*,
*Plaintiffs-Appellants*

v.

**ANNE ARUNDEL COUNTY, MARYLAND**, *et al.*,
*Defendant-Appellee*

---

On Appeal from the United States District Court
for the District of Maryland

---

## JURISDICTIONAL STATEMENT

Plaintiffs in this case are four federally and state licensed firearms dealers and Maryland Shall Issue, Inc., ("MSI") a Section 501(c)(4), a non-partisan, all-volunteer, membership advocacy organization. Plaintiffs challenge, on First Amendment grounds, an Anne Arundel Co., MD, ordinance enacted by County Bill 108-21 ("the Bill" or "the Ordinance"). The United States District Court for the District of Maryland had subject matter jurisdiction over that suit pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The district court's final judgment was entered on the docket on March 22, 2023, in an order that expressly closed the case. JA1690. Plaintiffs timely noticed their appeal on March 26, 2023. JA1691. This appeal is

from a final judgment disposing of all claims of all parties. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred in holding that an Ordinance enacted by Ann Arundel County, MD, compelling licensed firearms dealers in the County to display and distribute County created or adopted literature on "suicide" and "conflict resolution" is constitutional under the First Amendment, as construed by the Supreme Court in *Nat'l Inst. of Fam.& Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

2.    Whether the district court erred in excluding the expert report and testimony of plaintiffs' expert, Prof. Gary Kleck, and disregarding the testimony of the plaintiff dealers, solely because the court disagreed with the view of Prof. Kleck and plaintiffs that the County's literature plausibly asserts that access to firearms is a causal risk factor for suicide.

3.    Whether the district court erred in failing to grant plaintiffs' motion for summary judgment.

## STATEMENT OF THE CASE

### A.    Anne Arundel County Bill 108-21

In their Complaint filed April 11, 2022 (JA0009), plaintiffs challenged the constitutionality of Bill 108-21 ("the Bill" or "the Ordinance"), on First Amendment

2

grounds. The Bill was enacted into law by defendant, Anne Arundel County, MD ("the County"), on January 10, 2022, with an effective date of April 10, 2022. Complaint ¶ 1. Bill 108-21 amended the Anne Arundel County Code, Article 12, Title 6, Section 12-6-108, to provide:

> (A) Duties of Health Department. The Anne Arundel County health department shall prepare literature relating to gun safety, gun training, suicide prevention, mental health, and conflict resolution and distribute the literature to all establishments that sell guns or ammunition.
>
> (B) Requirements. Establishments that sell guns or ammunition shall make the literature distributed by the health department visible and available at the point of sale. These establishments shall also distribute the literature to all purchasers of guns or ammunition.
>
> (C) Enforcement. An authorized representative of the Anne Arundel County Health Department may issue a citation to an owner of an establishment that sells guns or ammunition for a violation of subsection 8(b). JA0023.

Bill 108-21 also provided that "a violation of this section is a Class C civil offense pursuant to § 9-2-101 of this code." JA0024. A Class C civil offense under Section 9-2-101 of the Anne Arundel County Code is punishable by a fine of "$500 for the first violation and $1,000 for the second or any subsequent violation."

## B.    Statement of Facts

The lead plaintiff-appellant in this case is Maryland Shall Issue, Inc., ("MSI"), a Section 501(c)(4), non-partisan, all volunteer, membership advocacy organization devoted to the protection of gun owners' rights in Maryland. JA0012-JA0013. The other  plaintiffs-appellants are federally, and State licensed firearms dealers located

in Anne Arundel County, Maryland ("plaintiff dealers"). JA0013-JA0016. Each of the plaintiff dealers is a member of MSI. The defendant, Anne Arundel County enacted an Ordinance, Bill 108-21, compelling licensed firearms detailers in the County to distribute County-created or adopted literature. A copy of the Ordinance is attached to the Complaint as Exhibit A. JA0023.

The County implemented Bill 108-21 by requiring firearms dealers in the County to distribute two pieces of literature. The first is a pamphlet entitled "Firearms and Suicide Prevention" published jointly by the National Shooting Sports Foundation ("NSSF") and the American Foundation for Suicide Prevention. A copy of that pamphlet is attached as Exhibit B to the Complaint. JA0027. This pamphlet states that "Some People are More at Risk for Suicide than Others" and includes within that category people who have "Access to lethal means, including firearms and drugs." JA0028. On the same page, the pamphlet states that "Risk factors are characteristics or conditions that increase the chance that a person may try to take their life." Id. The second piece of literature is a 6-inch square page setting forth information concerning County "resources" for "conflict resolution," including suicide. A copy of that piece of literature is attached as Exhibit C to the Complaint. JA0033.

Plaintiffs objected to being forced to distribute the County's literature, asserting in the Complaint that "Bill 108-21 constitutes 'compelled speech' in

4

violation of the plaintiff dealers' First Amendment rights." Verified Complaint ¶ 2, JA0010-JA0011. In particular, plaintiffs vigorously objected to the statement set forth in the suicide pamphlet that asserts that mere "access" to firearms is a "risk factor" for suicide. JA0028. Specifically, the pamphlet states in a large font heading that "Some People Are More At Risk For Suicide Than Others" and then includes within the scope of that declaration, People who have "Access to lethal means including firearms," effectively stating that "people" with "access" to firearms "are more at risk for suicide." JA0028. To one side of the same page, the pamphlet states "Risk factors are characteristics or conditions that increase the chance that a person may try to take their life." Id. The rest of that pamphlet then discusses suicide at length. The second pamphlet is attached to the Complaint as Exhibit C, JA0033, and consists of a list of County resources available for "conflict resolution." The Ordinance pertains only to firearms dealers or to sellers of ammunition and only firearms dealers and vendors are required to display and distribute the County's literature.

Plaintiffs' expert, Prof. Gary Kleck, is a renowned expert in the area of suicide and firearms. JA0489-JA0515. Prof. Kleck focused on the first pamphlet ("the suicide pamphlet") in his expert report, JA0464, stating:

> [T]he County, via this pamphlet, is claiming that access to firearms causes an increased chance of a person committing suicide. This assertion will be

hereafter referred to as 'the suicide claim.' It is my expert opinion that the suicide claim is not supported by the most credible available scientific evidence and is probably false. JA0466.

He further states in his expert report that "[t]he suicide claim is contradicted by much of the available scientific evidence, and is indisputably not purely factual and uncontroversial information." JA0466-JA0467.

Prof. Kleck elaborated on these points in his deposition, which lasted a full day and was videotaped as well as transcribed. Because of its size, the videotape of this deposition was submitted to the district court via an Internet link. JA0390. A full transcript of his entire deposition was also filed with the district court and is reproduced in the Joint Appendix at JA0046-JA0387.[1]

Prof. Kleck testified at his deposition that: "The point that it conveyed that was relevant to my expert witness report was that guns -- this pamphlet effectively states that possession of a gun or ownership of a gun increases the likelihood one will commit suicide." JA0060. At a later point in the deposition, he explained further:

Q.    Okay. Where on this page is the statement that you evaluated for purposes of your report?

---

[1] The video is very large (approximately 6.7 gigabytes in zip file format) but is unzipped and accessible via a Dropbox link at: https://www.dropbox.com/sh/togfntsop72ittq/AAAGe6E4YfjoCmdkIk9bxZcBa?dl=0. We urge the Court to view it.

6

A.    First of all, the title of the page as a whole, as you said, Some People Are More At Risk For Suicide Than Others, that introduces the topic of risk factors, which is reinforced in the lower right text, which reads, 'Risk factors are characteristics or conditions that increase the chance that a person may try to take their life.' That's unambiguously an assertion about causal effects.

JA0138-JA0139.

As he further explained, "implicit in the notion that owning a gun is a risk factor for suicide, and any reader would think suicide is a bad thing, then the implication is – the recommendation implied is don't own a gun." Id., JA0063.

### C.    The District Court's Decision

Plaintiffs and the County submitted cross-motions for summary judgment. Plaintiffs' motion was supported by the verification declarations of each of the plaintiffs verifying the allegations of the complaint (JA0034-JA0044), the expert witness report of Prof. Gary Kleck (JA0464), the interrogatories answers submitted by each of the plaintiffs (JA0392-JA0462), portions of the deposition transcriptions of each of the plaintiffs (JA0518-JA0693) and the videotape and transcript of Prof. Kleck's deposition (JA0046). The County's cross-motion for summary judgment was supported by the reports of two purported experts and numerous exhibits. JA0732-JA1604.

In their motion, plaintiffs contended that the Bill imposed content-based, compelled speech on the plaintiff dealers, and was thus presumptively unconstitutional under *Nat'l Inst. of Fam.& Life Advocs. v. Becerra*, 138 S. Ct. 2361,

2371 (2018) ("*NIFLA*"), and other controlling case law. JA0389. In response, the County quite intentionally made no attempt to carry the burdens demanded by strict scrutiny, arguing in their motion for summary judgment that the County need only satisfy the "rational basis" test of *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 628 (1985), to prevail.

In assessing this record, the district court agreed with plaintiffs that the County's literature was content-based compelled speech and thus presumptively unconstitutional. JA1675. But rather than apply that presumption, the district court agreed with the County's reliance on *Zauderer,* holding that the compelled literature created or adopted by the County was merely commercial speech that could be compelled under *Zauderer.* JA1676. The district court thus declined to apply any heightened scrutiny. The district court held that the County's literature asserted only a correlative effect between suicide and firearms, rather than a causal effect, and that assertion of a "correlative relationship" was both "purely factual" and "uncontroversial" under *Zauderer*. JA1685. On that sole basis, the district court excluded the expert witness testimony and report of Prof. Kleck, which the court found would have been otherwise admissible. JA1683.

The district court granted summary judgment to the County and denied plaintiffs' motion for summary judgment. JA1690. Plaintiffs filed a timely notice of appeal, appealing both the grant of the County's motion for summary judgment and

the denial of plaintiffs' motion. JA1691. In this appeal, plaintiffs seek reversal of summary judgment for the County and reversal of the district court's order denying plaintiffs' motion for summary judgment and thus urge that judgment below be reversed and the case remanded with instructions to enter judgment for plaintiffs.

## SUMMARY OF ARGUMENT

1. No one in this case disputes that the forced distribution of the County's literature by the plaintiff dealers constitutes content-based compelled speech. Under well-established principles, content-based, compelled speech is presumptively unconstitutional, thereby shifting the burden to the government to justify compelled speech under strict scrutiny. *National Institute of Family Life Advocates v. Becerra,* 138 S.Ct. 2361, 2371 (2018) ("*NIFLA*"). The plaintiff dealers are compelled to display the County's literature and are subjected to the County's Ordinance on every sale of a firearm or ammunition. A failure to comply, even by mistake or inadvertence, could result in ruinous fines, as the County's Ordinance lacks any *mens rea* element. With every passing day, the plaintiff dealers' First Amendment rights to be free of compelled speech are sacrificed.

But rather than apply these well-established principles, the district court sustained the County's imposition of compelled speech under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). In so holding, the district court agreed that the County's Ordinance commanded content-

9

based compelled speech and was thus presumptively unconstitutional. The district court nonetheless held that the Ordinance merely regulated commercial speech and declined to apply or follow the Supreme Court's decision in *NIFLA*. That holding was wrong as a matter of law.

Purporting to apply *Zauderer*, the district court held that the County's literature asserted only a correlation between access to firearms and suicide, not that such access caused suicide. For that reason (alone), the court concluded that the County's literature was merely factual and uncontroversial regulations of commercial speech. Those holdings disregard the plain language in the literature. As noted, the suicide pamphlet asserts that persons who have mere "access" to firearms "are More at Risk for Suicide than Others" (language that the district court completely ignored). Instead of taking note of that language, the district court focused on "risk factors," ruling that "risk factor" merely means "correlation." But that definition is directly contrary to both standard and medical dictionary definitions of the term. The Court likewise rejected the report and testimony of plaintiffs' expert witness, solely because the district court disagreed with Prof. Kleck's view that the County's literature asserted a causal connection between the mere access to firearms and suicide. That Prof. Kleck is a renowned expert in this field was irrelevant to the district court.

2.  In granting the County's motion for summary judgment the district court breached its duty to accord every fair inference to plaintiffs from the evidence and improperly acted as the trier of fact. The evidence, at a minimum, supports a fair inference that the County's literature asserts a causal connection. On motions for summary judgment, the district court may not disagree with an expert's reading of evidence, and then exclude an otherwise qualified expert's opinion on that basis, where the expert's opinion is based on a fair inference taken from the evidence. The trier of fact must be allowed to consider that opinion and any evidence that supports that opinion. The district court thus abused its discretion in excluding Prof. Kleck's testimony and discarding the sworn testimony of the plaintiffs, all of whom likewise view the County's literature as making a causal assertion. Summary judgment for the County was error on this ground alone.

3.  However, whether the County's compelled speech asserts a causal effect is relevant to this appeal only if the district court is otherwise correct in its legal analysis of *Zauderer* and *NIFLA*. Here, the district court misapplied *Zauderer*, and that error is enough to decide this case. Under *NIFLA*, the County's content-based, compelled speech is presumptively unconstitutional, and the County bears the burden of showing that its ordinance is justified under a strict scrutiny standard of review. The County quite intentionally made no attempt to do so, arguing instead that it merely needed to satisfy the "rational basis" test of *Zauderer* to prevail. That

11

reliance on *Zauderer*, accepted by the district court below, fails as a matter of law. Plaintiffs are entitled to judgment under *NIFLA*, and, for that reason, the district court erred in failing to grant summary judgment for plaintiffs on their motion for summary judgment. This Court should reverse and remand with instructions to enter judgment for plaintiffs.

## ARGUMENT

### I.    STANDARD OF REVIEW

"In reviewing a grant of summary judgment, we must apply a de novo standard of review, drawing all reasonable inferences in favor of the nonmoving party." *Westfarm Associates Ltd. Partnership v. Washington Suburban Sanitary Com'n*, 66 F.3d 669, 678 (4th Cir. 1995). Accord *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020). A district court errs in its duty to draw "reasonable inferences" in favor of the non-moving party when the court "weigh[s] the evidence and reach[es] factual inferences contrary to [nonmoving party's] competent evidence." *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). The district court's evidentiary rulings are subject to review for an abuse of discretion. *In re Lipitor*, 892 F.3d 624, 632 (4th Cir. 2018).

## II.    THIS CASE IS CONTROLLED BY *NIFLA*, NOT *ZAUDERER*

### A.    First Principles

"The First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment." *Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council Inc.*, 425 U.S. 748, 749 n.1 (1976); *Lovell v. Griffin,* 303 U.S. 444, 450 (1938). The Supreme Court's "leading First Amendment precedents have established the principle that freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006). "[N]o official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943). "Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. American Fed. of State, Co. and Mun. Employees, Council 31*, 138 S.Ct. 2448, 2463 (2018). Such compulsion is "universally condemned." *Janus*, 138 S.Ct. at 2463-64. Compelled speech is content based where it "[m]andat[es] speech that a speaker would not otherwise make." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988). Any state action "which forces an individual ... to be an instrument for fostering public adherence to an ideological point of view" is unacceptable under the First Amendment. *Wooley v. Maynard*, 430

13

U.S. 705, 717 (1977). The State may not use a vendor's services or its "private property as a 'mobile billboard' for the State's ideological message." *Wooley*, 430 U.S. at 715, 717.

The government also may not command a person to serve as a "conduit" for government speech and may not be "'forced either to appear to agree with [the intruding leaflet] or to respond.'" *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 575 (1995), quoting *Pacific Gas & Electric Co. v. Public Utilities Com'n.*, 475 U.S. 1, 15 (1986). See also *Boy Scouts of America. v. Dale*, 530 U.S. 640, 660 (2000) ("[T]he fact that an idea may be embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view."). There "is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say." *Riley*, 487 U.S. at 796-97. This prohibition against compelled speech is not limited to ideological messages; it extends equally to compelled statements of fact. See *Riley*, 487 U.S. at 797-98 ("These cases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech.").

This Court is in accord. In *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council Of Baltimore*, 879 F.3d 101, 111 (4th Cir.), *cert. denied*, 138 S.Ct. 2710 (2018), the Court applied the First Amendment to strike down a Baltimore ordinance which required any "limited-service" pregnancy center in the City to provide a disclaimer to its patrons, stating that the center did not provide or make any referral for abortion or birth-control services. In so holding, the Court ruled that the disclaimer was unconstitutional compelled speech and that the centers had a First Amendment "right not to utter political and philosophical beliefs that the state wishes to have said."

This Court has also recognized a First Amendment right "not to speak" because "the right to refrain from speaking is concerned with preventing the government from '[c]ompelling individuals to mouth support for views they find objectionable.'" *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 222 (4th Cir. 2019), quoting *Janus*, 138 S.Ct. at 2463. This Court has likewise recognized that "[t]he Supreme Court has emphasized that there is no constitutional difference between 'compelled statements of opinion' and 'compelled statements of fact' because 'either form of compulsion burdens protected speech.'" *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019), quoting *Riley*, 487 U.S. at 797-98.

15

**B.** ***Zauderer* Was Sharply Limited By *NIFLA***

The district court erroneously held that the County's Ordinance was subject only to rational basis scrutiny under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). *Zauderer* assessed the constitutionality of restraints on advertising and solicitation by attorneys. The Court first held that "'commercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech,'" finding that the "speech at issue" in *Zauderer*, was commercial speech because it restricted "advertising pure and simple." (471 U.S. at 637). The Court stated that "[t]he States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading, * * * or that proposes an illegal transaction." Id. at 638. The Supreme Court also held that the state was free to impose "disclosure requirements" in the terms of service for contingency fee cases informing clients that they might be liable for significant litigation costs even if their lawsuits were unsuccessful. The Court stated that the disclosure requirement at issue in that case was constitutional because it "attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available." Id. at 651.

16

*NIFLA* sharply limited the reach of *Zauderer* to its facts, holding that the more deferential view permitted by *Zauderer* for compelled speech is "limited to 'purely factual and uncontroversial information *about the terms under which ... services will be available*.'" *NIFLA*, 138 S.Ct.. at 2372, quoting *Zauderer*, 471 U.S. at 651 (emphasis added). The Court in *NIFLA* then reiterated its holding in *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995), that "*Zauderer* does not apply outside of these circumstances." *NIFLA*, 138 S.Ct. at 2372 (emphasis added). As explained in *Hurley*, while the State "may at times 'prescribe what shall be *orthodox in commercial advertising'* by requiring the dissemination of 'purely factual and uncontroversial information,' *outside that context it may not compel affirmation of a belief with which the speaker disagrees*." *Hurley*, 515 U.S. at 573 (citations omitted) (emphasis added).

This Court had the occasion to address both *NIFLA* and *Zauderer* recently in *Recht v. Morrisey*, 32 F.4th 398 (4th Cir. 2022). *Recht* involved a state statute that regulated legal advertisements soliciting clients for litigation involving medications or medical devices. The statute restricted the terms of such advertisements and required health and safety disclosures stating that discontinuing medications "'can result in injury or death'" and that patients should "consult[] their doctors" in those circumstances. 32 F.4th at 416. The Court first sustained the restrictions imposed on speech by the statute, applying the intermediate scrutiny test of *Central Hudson Gas*

17

& *Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 561 (1980). See *Recht*, 32 F.4th at 410 ("Applying *Central Hudson*'s framework, we conclude that the Act's prohibitions survive constitutional scrutiny."). Neither the district court nor the County purported to rely on *Central Hudson*.

After sustaining, under *Central Hudson*, the constitutionality of the *restrictions* imposed on the commercial speech there at issue, the *Recht* court then turned to "the Act's disclosure requirements," holding these requirements were constitutional under *Zauderer*. 32 F.4th at 416. In so holding, the Court distinguished *NIFLA*, holding that the disclosure requirement at issue in *Recht* was "far from the boundary line staked out by *NIFLA*." 32 F.4th at 417. Specifically, the Court ruled that the statute's disclosure requirement was, as in *Zauderer*, "directly targeted at promoting the State's interest 'in dissipat[ing] the possibility of consumer confusion or deception.'" Id., quoting *Zauderer*, 471 U.S. at 651. This Court stressed as well that the disclosure requirements "do so by providing information *directly connected to the subject of the advertisement*, rather than by compelling speech concerning unrelated or competing services." Id. (emphasis added). The only question, the Court ruled, was whether the required disclosures "are 'factual and uncontroversial.'" Id., quoting *NIFLA*, 138 S.Ct. at 2376. The Court found that these requirements were satisfied in that case because "the disclosure that patients should consult with their doctor before discontinuing medication simply communicates to the audience the

factual and uncontroversial point that the advice of a physician mitigates this risk of injury or death." Id. at 417.

### C. The District Court Misapplied *NIFLA*.

#### 1. The *NIFLA* standard and the district court's ruling

The district court first held that the County's ordinance "plainly imposes compelled speech on the retailers, providing them an alleged constitutional injury-in-fact." JA1667-JA1668. The court likewise recognized that "[c]ontent-based laws—those that regulate speech based on its message—are presumptively unconstitutional" and that "for content-based laws, the government must show the law is narrowly tailored to serve compelling state interests." JA 1675, citing *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Those holdings of the district court are correct. Here, the County has never attempted to deny that its literature was content-based, and the point is too obvious to be a matter of dispute. See *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S.Ct. 1464, 1471 (2022) ("A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'"), quoting *Reed*, 576 U.S. at 163. The whole point of the Ordinance is to force the dealers to display and distribute the County's content. That makes it presumptively unconstitutional.

19

Notwithstanding those holdings, the district court refused to apply the heightened inquiry that strict scrutiny commands. Rather, the district court purported to rely on *NIFLA*, stating that the Supreme Court applies a "'a lower level of scrutiny to laws that compel disclosures in certain contexts,' including cases analyzing the required disclosure of 'factual, noncontroversial information in . . . commercial speech.'" JA1676, quoting *NIFLA*, 138 S. Ct. at 2372. According to the district court, "to qualify as permissible under *Zauderer*, as affirmed in *NIFLA*, the County's pamphlets must be (1) commercial speech, (2) purely factual and uncontroversial information, and (3) reasonably related to the County's interest." JA1676. Thus, in the district court's view, the County need only show that the compelled speech is "in the context of the commercial transaction." JA1676. The district court thus ruled that the compelled speech need not "propose a commercial transaction" and need not even relate to advertising or the prevention of consumer confusion. JA1680. The court likened the County's literature to uncontroversial health and safety warnings about a product. JA1676.

## 2.    The district court misapplied *NIFLA* and *Zauderer*

The district court's application of *Zauderer* and concomitant refusal to apply *NIFLA* was error. First, the court inexplicably ignored *NIFLA's* holding that *Zauderer* is "*limited to 'purely factual and uncontroversial information about the terms under which ... services will be available*.'" *NIFLA*, 138 S.Ct. at 2172, quoting

*Zauderer*, 471 U.S. at 651 (emphasis added). The Supreme Court left no doubt on this score, ruling that "*Zauderer does not apply* outside of these circumstances." *NIFLA*, 138 S.Ct. at 2372 (emphasis added). That ruling could hardly be clearer. Thus, in *NIFLA*, the Court expressly rejected *Zauderer* because the speech imposed upon licensed clinics by California in that case did not "relate[ ] to the services that licensed clinics provide[d]," and it concerned the controversial topic of abortion. *NIFLA*, 138 S.Ct. at 2372.

In this case, the district court never so much as even *mentioned* these key rulings in *NIFLA* even though it was prominent in the briefing below. At the relevant portion in its opinion, the district court stated, "the U.S. Supreme Court applies 'a lower level of scrutiny to laws that compel disclosures in certain contexts,' including cases analyzing the required disclosure of 'factual, noncontroversial information in . . . 'commercial speech.'" That quoted language combines into one sentence different language from two different paragraphs of *NIFLA*. The paragraph at which the Supreme Court is referring to the "lower level of scrutiny" states that this "lower level" is applicable to circumstances where the required disclosure is of "'purely factual and uncontroversial information **about the terms under which ... services will be available.**'" Id. The district court's quotation omits the part in bold. The district court's quotation to "'factual, noncontroversial information in . . . 'commercial speech'" appears in the *prior* paragraph of *NIFLA* in which the Court

stated that a "more deferential review" has been applied "to some laws that **require professionals** to disclose factual, noncontroversial information in their 'commercial speech.'" Id. The district court's quotation omits the reference to "professionals" in that sentence, using ellipses to delete "their" which, of course, refers to "professionals." The plaintiff dealers here are indisputably not "professionals" and that matters.  See *Greater Baltimore Center*, 879 F.3d at 109-110.

The district court likewise never addresses the language in *NIFLA* in which the Court holds that "[t]he *Zauderer* standard does not apply here" because, "[m]ost obviously, the licensed notice is not limited to 'purely factual and uncontroversial information *about the terms under which ... services will be available*.'" 138 S.Ct. at 2372, quoting *Zauderer*, 471 U.S. at 651 (emphasis added). That is the statement of the governing rule of law. Nor does the district court mention the language in the **very next** sentence in *NIFLA* in which the Court relies on *Hurley* as "*explaining that Zauderer does not apply outside of these circumstances*." Id. (emphasis added). Finally, the district court skipped over the Court's application of these principles in the next three sentences of *NIFLA* where the Court states its actual holding:

> The notice [required by California] *in no way relates to the services that licensed clinics provide.* Instead, it requires these clinics to disclose information about state-sponsored services—including abortion, anything but an "uncontroversial" topic. *Accordingly, Zauderer has no application here*.

Id. (emphasis added).

That holding could hardly be clearer. *NIFLA* requires that the compelled speech

"relate[] to the services" provided by the coerced party **in addition to** being limited to an "'uncontroversial topic.'" There is simply no way to read this language as doing away with the requirement that the compelled speech must "relate[] to the services" of the coerced party. Yet, the district court here never even mentions this requirement, much less purports to apply it.

Application of *NIFLA's* holding in this case is straightforward. Nothing in the County's literature remotely addresses "the terms under which services" by the dealers are available. The plaintiff dealers are not in the business of providing suicide or conflict resolution services. Nothing in the Ordinance requires any disclosures as part of any advertising done by dealers or relates to "the terms of service" by the dealer. The display requirement applies regardless of whether the dealer ever makes a single sale. The distribution requirement applies to every sale of a firearm or a box of ammunition, regardless of whether the dealer or vendor engages in any act of communication. Likewise, as in *NIFLA*, the County's literature relates **not** to services offered by the dealer, but to services offered **by the County** to advance the **County's** policy interests, just like the notices required by California in *NIFLA*. In *NIFLA*, the Court struck down California for precisely this reason, *viz*, the compelled speech "in no way relates to the services that licensed clinics provide. Instead, it requires these clinics to disclose information about state-sponsored services" 138 S.Ct. at 2372.

23

But it gets worse. As noted above, instead of applying the express limits on *Zauderer* set out in *NIFLA*, the district court believed that the only thing that mattered was whether that the compelled speech is "in the context of the commercial transaction." JA1679. Purporting to rely on *Greater Baltimore Center*, the court then defined "commercial speech" broadly to include: "'(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech.'" JA1677, quoting *Greater Baltimore Center*, 879 F.3d at 108. The district court concluded that these factors were satisfied because "the Ordinance regulates commercial retailers" and because the "literature is available at the 'point of sale' and is provided to 'all purchasers of guns or ammunition,'" JA1678, and arose in "the context of the commercial transaction." JA1679.

The district court's analysis fails for multiple reasons. First, as noted above, *NIFLA* holds that *Zauderer* is "limited to 'purely factual and uncontroversial information about *the terms under which ... services will be available*.'" *NIFLA*, 138 S.Ct. at 2172 (emphasis added). Nothing in *NIFLA* extends *Zauderer* to all "commercial speech," however that term is defined. Quite to the contrary, *NIFLA* makes clear that the test under *Zauderer* is not whether the compelled speech is "commercial" but whether the compelled speech is about a "the terms under which services will be available." After *NIFLA*, the district court was wrong to import

24

broad notions concerning "commercial speech" into the *NIFLA* analysis. Again, the district court simply ignored *NIFLA's* holding on this point.

Second, the district court erred in relying on *Greater Baltimore Center*. Nothing in the actual holding or reasoning in *Greater Baltimore Center* supports the district court's decision here. Quite to the contrary, *Greater Baltimore Center* held that the Baltimore's compelled speech ordinance there at issue was unconstitutional because "[t]he ordinance, as applied to the [the plaintiffs], does not regulate speech that "propose[s] a commercial transaction," and it applied to the plaintiffs "regardless of whether they advertise at all." *Greater Baltimore Center,* 879 F.3d at 108-09. See also *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.,* 191 F.3d 429, 440 (4th Cir. 1999) ("In the abstract, the definition of commercial speech appears to be fairly straightforward, if somewhat circular: it is speech that proposes a commercial transaction."). So too here. Nothing in *Greater Baltimore Center* purports to suggest that the government may compel speech if it is in "the context of the commercial transaction." JA1679.

Here, the district court rejected plaintiffs' argument that *Zauderer* did not apply where the regulation did not "propose[] a commercial transaction." JA1680. Instead, the district court held that a "proposal" of a transaction was not necessary. Rather, the only thing that mattered, in the district court's view, was whether the transaction regulated by the Ordinance could be characterized as "commercial" in

25

some way. The district court thus held that the transactions regulated by Ordinance were "commercial" because the County's literature was similar, in the district court's view, to the literature at issue in *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 64 (1983). JA1680-JA1681. In *Bolger*, the Supreme Court applied *Central Hudson* to strike down a ban on the commercial mailing of contraception information by the plaintiff.

The *Bolger* situation would be presented here if the County was a private entity and was asserting a First Amendment right to distribute its literature commercially under *Central Hudson*. As *Recht* makes clear, *Central Hudson* applies to *restrictions* on speech, while *NIFLA* and *Zauderer* apply to compelled speech cases. That a given content may be commercial speech under *Central Hudson* does not mean, for that reason alone, that the government is free to *compel third parties* to display and distribute the same material over their objections. The inquiry and the tests are entirely different. In essence, the district court simply used the commercial speech criteria spelled out in *Greater Baltimore* to hold that *Zauderer* applied to all commercial speech, regardless of whether the speech "proposed" a commercial transaction and regardless of whether the compelled speech relates to the services provided by the coerced party. That holding is obvious error for the reasons stated above.

But even assuming *arguendo* that the considerations for "commercial speech"

outlined in *Greater Baltimore Center* could inform the application of *Zauderer* after *NIFLA*, the County's literature does not satisfy those criteria. The County's literature is certainly not "an advertisement." Neither the County nor the plaintiff dealers "have an economic motivation for the speech." The Ordinance is applicable only to firearms dealers, ammunition vendors and their customers and no one else. Apparently, in the County's view, people who go into gun stores or buy ammunition or firearms are uniquely in need of education about suicide and "conflict resolution." That message is highly offensive. As Prof. Kleck stated in his deposition, "the recommendation implied is don't own a gun." JA0063. As in *Greater Baltimore Center,* the County has "[w]eaponiz[ed] the means of government against ideological foes." 879 F.3d at 113.

Similarly, the County's literature does not refer to "a *specific* product or service" of the type discussed in *Greater Baltimore Center* as part of its test for commercial speech. It refers to suicide and **County's** services for suicide prevention and conflict resolution. While it also talks about safe storage and "access" to "firearms," that discussion is a just a part of its much broader message. The term "specific product or service" as used in *Greater Baltimore Central* cannot be construed to include all "firearms" of any kind, ranging from the smallest pistol to the largest elephant rifle. Nor can "specific product or service" be read to encompass any commercial transaction that merely involves a product or service, as the district

court opined. Rather the term must be given meaning by reference to the type of compelled speech permitted by *Zauderer*. As explained, *Zauderer* applies only insofar as it would allow the government to force a business to *include* speech that relates "directly" to the speech otherwise voluntarily being undertaken by the business about a "specific" service or product. Thus, in *Greater Baltimore Center*, this Court struck down the City's ordinance because it did not purport to regulate a "propose[d] commercial transaction" by the centers. *NIFLA* further limits *Zauderer* to compelled speech about the "terms of service" being rendered. Nothing in the Ordinance is limited to these circumstances.

### 3. The district court's ruling is contrary to *Recht*

*Greater Baltimore Center* was decided before *NIFLA* and thus this Court had no occasion to address *NIFLA*'s holding that *Zauderer* is "limited to 'purely factual and uncontroversial information about the terms under which ... services will be available.'" *NIFLA*, 138 S.Ct. at 2172. However, in *Recht*, decided after *NIFLA*, this Court did have such an occasion. There, as noted above, this Court first addressed *restrictions* on commercial speech under *Central Hudson*, defining "commercial speech" in that context to mean an "'expression *related solely* to the *economic interests* of the speaker and its audience.'" *Recht*, 32 F.4th at 407, quoting *Central Hudson*, 447 U.S. at 561 (emphasis added). That narrow focus ensures that the government's regulation is confined to economic matters, not the political or

28

ideological preferences of the government.

*Recht* was heavily briefed below by plaintiffs, but the district court simply ignored the analysis in *Recht*. Not even the County asserts that its literature relates "solely to the economic interests" of the plaintiff dealers or of their customers. Nothing in the literature even "proposes a commercial transaction." *Recht* thus refutes the district court's ruling that the County's literature is "commercial speech." It should be obvious that the County may not compel speech under *Zauderer* that it cannot restrict under *Central Hudson*. In any event, the test for compelled speech is more limited, as *NIFLA* makes clear that compelled speech (whether it be commercial or otherwise) must be purely factual, noncontroversial, and limited to the "terms of services" provided by the coerced party.

After disposing of restrictions imposed in that case under *Central Hudson*, *Recht* then turned to the compelled speech at issue in that case. The Court ruled that, after *NIFLA*, *Zauderer* remained applicable to situations where the compelled speech was "directly targeted at promoting the State's interest 'in dissipat[ing] the possibility of consumer confusion or deception" and did so "by providing information *directly connected to the subject of the advertisement*, rather than by compelling speech concerning unrelated or competing services." 32 F.4th at 417 (emphasis added). Yet, in this case, the district court ignored *Recht*'s analysis entirely and applied *Zauderer* to allow the County to compel speech having nothing

to do with any "subject" of any "advertisement." The Ordinance does not regulate advertising and thus there is no possibility of "consumer confusion or deception." *Recht* likewise makes clear that the County may not compel speech "concerning unrelated or competing services" like the services being offered by the County for suicide prevention and conflict resolution.

### 4.    The County's literature is not a "product warning"

For similar reasons, the district court erred in likening the County's compelled speech to product safety warnings, such as "choking hazard labels on toys' packaging and the long list of drugs' side effects." JA1681. Such health and safety warnings are of a type "long considered permissible," *NIFLA*, 138 S.Ct. at 2376. As explained above, the County's literature does not apply to any specific product or service or purport to warn consumers that the product has hidden dangers that justify a warning. Such warnings typically relate to uses of the very specific product or type of product being advertised or sold by the seller.[2] Every purchaser of firearms from

---

[2] Warnings on toys are governed by the Child Safety Protection Act, Pub.L. No. 103–267, 108 Stat. 722 (1994) ("CSPA"), codified at 15 U.S.C. §§ 1261-1278. The CSPA applies only to "[t]he packaging of any toy or game intended for use by children who are at least 3 years old but not older than 6 years," and sets forth the precise warning that must be given. 15 U.S.C. §1278. It also has a preemption provision that bars a state from enforcing any state law that is different from that imposed by federal law. See CSPA § 101(e), reprinted at 15 U.S.C. § 1278 Note. A similar regulatory scheme is imposed for drug labels. See Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(a),(d); 21 C.F.R. § 314.105(b). Nothing in the County's literature is remotely like such narrow and specific provisions.

a licensed dealer already knows that a firearm can be dangerous if misused.

Indeed, the same is true of rope, as hanging is an equally lethal form of suicide and the second most common mode of suicide. See Prof. Kleck Dep., JA0199 ("the suicide data at the macro-level indicates that there's no significant difference in the fatality rates or case fatality rates of suicide attempts by hanging and suicide attempts by firearms, which is crucial to the hypothesis that that is the way by which having access to a gun would increase your risk of suicide"). See also Prof. Kleck Rep., JA0480 ("The underlying issue in this area is whether firearms provide a uniquely lethal method of suicide and whether other methods likely be substituted for shooting if guns were unavailable would be equally likely to have fatal outcomes").

Yet even though rope can be and commonly is used for suicide, nothing in County's literature addresses suicide by hanging or suggests that "access" to a rope makes a person "More at Risk for Suicide than Others." JA0028. The Ordinance does not require hardware stores that sell rope to display and distribute the County's literature. Nor are drug stores or pharmacies required to do so, even though the literature expressly states that people with access to "drugs" "are More at Risk for Suicide than Others." JA0028. The compelled speech only applies to sellers of firearms or ammunition and their customers. The County's Ordinance is thus vastly underinclusive. See Prof. Kleck's Rep. at 4, JA0467 ("as a logical point, the County's mandate to require only firearms dealers to distribute this pamphlet is

31

under-inclusive as to who might be distributing materials whose availability might affect suicide."). As Prof. Kleck states, "[t]he narrow, indeed exclusive, focus of the Ordinance on firearms dealers is arbitrary and inconsistent with accepted information on the many and varied ways that people commit suicide." Id.

Again, this focus on firearms and only firearms (and ammunition for firearms) make plain that the real purpose of the literature is to discourage the purchase and possession of firearms and ammunition by linking possession of firearms to suicide and illegal conflict resolution. Yet, the purchase and possession of firearms and ammunition by law-abiding adults are constitutional rights. See, e.g., *District of Columbia v. Heller*, 554 U.S. 570 (2008); *NYSRA v. Bruen*, 142 S.Ct. 2111 (2022); *MSI v. Hogan,* 971 F.3d 199, 216-17 (4th Cir. 2020). The County has no legitimate interest in discouraging or demonizing the exercise of Second Amendment rights. As explained, *infra*, plaintiffs strongly take issue with the County's attempt to link firearms to suicides and illegal conflict resolutions.

### 5.    The district court's other errors

The district court stated that the plaintiffs do not "take issue with the County's goal of reducing the number of suicides and violent conflict resolutions." JA1687. Of course not. No sane person is opposed to legitimate efforts to reduce suicide or illegal violent conflict. Plaintiffs "take issue" with being coerced into being an unwilling conduit for the County's offensive speech linking the mere access to

firearms to suicide and illegal violence. The County may not impose discriminatory, underinclusive mandates solely on firearm dealers and purchasers and expect anyone to believe that its motives are anything other than to inhibit the exercise of Second Amendment rights.

But even assuming *arguendo* that the County's motives are pure, the County's goals, no matter how laudatory, cannot be achieved through unconstitutional means. See, e.g., *South Carolina v. Baker*, 485 U.S. 505, 516 (1988) ("Congress cannot employ unconstitutional means to reach a constitutional end"). Governments may not, consistent with First Amendment, compel speech merely because they think their compelled messages are good policy. Under the First Amendment, content-based, compelled speech is presumptively unconstitutional unless the government can satisfy the demands of strict scrutiny, *viz.,* a narrowly tailored statute imposed for a compelling governmental purpose. The County never even attempted to meet this standard.

Likewise irrelevant is whether the burden on plaintiffs is slight or that "the gun retailer could lawfully explain to the customer that the County requires distribution of the pamphlets," as the district court opined. JA1688. That dealers are free to disavow the County's message at the time of sale arguably makes the First Amendment violation worse, for not only must the plaintiff dealers display and distribute the County's offensive literature over their objections, but they are also

33

effectively forced to vocalize their objections and disagreements to their customers when they would prefer to keep silent. Verified Complaint ¶ 21, JA0019. All the plaintiff dealers "would prefer to stay silent with respect to suicide prevention and conflict resolution." JA0411-12 (Cindy Hot Shots); JA0400-JA0401 (Field Traders); JA0425 (Pasadena Arms); JA0439 (Worth-A-Shot). But unless they speak up in opposition customers may conclude that the dealer is endorsing the notions that persons "are" more likely to commit suicide merely by having access to a firearm and are uniquely prone to indulge in illegal conflict resolution because they have purchased or possess a firearm or ammunition. Id.

It is also irrelevant whether the County's literature is true. Outside of the narrow confines of *Zauderer*, as limited by *NIFLA*, the government may no more compel statements of fact than it may compel statements of opinion. As noted above, "there is no constitutional difference between 'compelled statements of opinion' and 'compelled statements of fact' because 'either form of compulsion burdens protected speech.'" *Washington Post*, 944 F.3d at 518, quoting *Riley*, 487 U.S. at 797-98. See also *Greater Baltimore Center*, 879 F.3d at 110 ("a person's right to refrain from speaking 'applies ... equally to statements of fact the speaker would rather avoid.'"), quoting *Hurley*, 515 U.S. at 573. The County is perfectly well-equipped to be its own orator for its views. It may not commandeer plaintiffs. See *Greater Baltimore Center*, 879 F.3d at 112 ("in compelled speech cases, the government itself may

34

'communicate the desired information to the public without burdening a speaker with unwanted speech'"), quoting *Riley*, 487 U.S. at 800.

Finally, the district court's commercial speech approach to *Zauderer* and *NIFLA* ultimately proves too much for it is without any limiting principle. Under the district court's boundless analysis, the County's compelled speech materials are constitutional because they "discuss the relationship of the economic product to an important public health issue." JA1681. The district court ruled that neither the coerced party nor the government need have any economic interests in the coerced speech. Similarly irrelevant is whether the coerced party is "proposing" a transaction or even whether the coerced party is otherwise speaking or advertising. To the district court, all that matters is whether the compelled speech is imposed "in context of the commercial transaction." JA1679. If it is, then, according to the district court, the government is free to impose any speech it wants if the compelled speech otherwise meets the other requirements set forth in *Zauderer*, *viz*, be purely factual and uncontroversial. That holding is breathtaking in its invasion of First Amendment rights.

For example, under the district court's approach, every gasoline station owner or franchisee could be coerced into displaying and distributing the government's preferred views about carbon dioxide emissions and the perils of global climate change because the link between carbon fuels and climate change is an "important

public health issue." Private hospitals, pharmacies, and other healthcare facilities and practitioners could be made to distribute government literature about health issues or medical procedures as these facilities and persons all render commercial services on such matters. Pick any government policy, and the government could undoubtedly find private parties engaged in related commercial transactions and who could thus be compelled to display and distribute literature in support of a government policy. The potential for abuse is virtually unlimited. See *Greater Baltimore Center*, 879 F.3d at 111 ("states can bend individuals to their own beliefs and use compelled speech as a weapon to run its ideological foes into the ground").

### D.    The Literature  Is Not Purely Factual and Uncontroversial
####     1.    The literature is not "purely factual"

The district court rejected the views of plaintiffs and of plaintiffs' expert, all of whom read the County's compelled literature as asserting that mere access to firearms is a causal factor in suicides. Instead, the district court accepted the County's argument that the literature stated that suicides and firearms were merely "correlated," not that access to firearms was a causal factor in suicides. The district court thus opined that the literature merely stated that firearms were a "risk factor," stating "[b]y using the language of "risk factor" rather than "cause," the pamphlet specifically avoids making any causal accusation." JA1684. Purporting to rely on Black's Law Dictionary's definition of a "risk factor" as "'[a]nything that increases

36

the possibility of harm or any other undesirable result,'" the court reasoned that the statement merely asserted a correlation, not a causal relationship, and that mere "'correlation does not prove causation.'" JA1684-JA1685, quoting *MSI*, 971 F.3d at 213.

The district court's holding is flawed in multiple ways. First, the district court's ruling that the County's literature does not assert a causal relationship is inexplicable. As noted, the County's literature expressly states that "people" with "access" to firearms "**are** More at Risk For Suicide that Others." JA0028 (emphasis added). The verb "are" is the simple present tense in the second person of the verb "to be." And "the verb 'to be' means to exist." https://www.grammarly.com/blog/to-be/. On summary judgment, plaintiffs are entitled to all fair inferences created by that commonly understood usage. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Yet, the district court ignored this express language, not mentioning it at all. The court instead ruled that the literature merely described access to firearms as a "risk factor," and then held, *ipse dixit*, that a "risk factor" is not causal. Slip op. at 25-26, JA1684-JA1685. That ruling blinks the expressly causal language used in the literature.

Moreover, the district court's holding that a "risk factor" is not causal is refuted by the very definition of "risk factor" set forth in Black's Law Dictionary on which the court purported to rely. As the district court stated, Black's definition of a

37

"risk factor" is something that "increases the possibility of harm" but that is just another way of saying that it "**causes** an increased possibility of harm." Indeed, the pamphlet itself states that "Risk factors **are** characteristics or conditions **that increase** the chance that a person may try to take their life." JA0028 (emphasis added). Once again, the literature uses the verb "are" to describe the link.

These are statements of causation, as confirmed by medical dictionaries and non-medical dictionaries alike. See Mosby's Dictionary of Medicine, Nursing & Health Professionals 1634 (8th ed. 2009) (a risk factor "*causes* a person ... to be particularly susceptible to an unwanted ... event") (emphasis added); https://medical-dictionary.thefreedictionary.com/risk+factor ("risk factor an agent or situation that is *known to make* an individual or population more susceptible to the development of a specific negative condition")(emphasis added); https://www.britannica.com/dictionary/risk-factor ("something that increases risk especially : something that makes a person more likely to get a particular disease or condition"); https://www.cancer.gov/publications/dictionaries/cancer-terms/def/risk-factor ("Something that increases the chance of developing a disease."). Certainly nothing in the County's literature states that access to firearms is merely "correlated" with suicide. The term "correlated" does not appear in the County's literature. Only after a truly tortured reading of the County's literature as presenting merely a "correlational relationship" was the district court able to rule the

literature presented a "purely factual" statement. JA1685.

Second, if access to firearms is merely "correlated" with suicide, as the district court ruled and as the County contends, then the language used in the County's literature is, at the very least, highly misleading, and deceptive. No one, not even the County, has argued that the County has a legitimate interest in compelling speech that is misleading. As the district court's ruling and the County's position necessarily recognize, the purported causal effect between access to firearms and suicide and illegal conflict resolution is highly controversial and thus impermissible under *Zauderer* and *NIFLA*. As Prof. Kleck states, that "[t]he suicide claim is contradicted by much of the available scientific evidence, and is indisputably not purely factual and uncontroversial information." JA0466-JA0467. See *American Beverage Assn. v. City and County of San Francisco*, 916 F.3d 749, 761 (9th Cir. 2019) (Christen, J., concurring) ("*Zauderer* and subsequent case law leave no doubt that any government-compelled speech must be, at the very least, factually accurate.").

Third, and even more fundamentally, if access to firearms is not causal for suicide or illegal conflict resolution (and again, the County has **not** asserted a causal connection justification in this case), then there is no point, much less a justification, to the compelled distribution of the County's literature. As Prof. Kleck explains, if the term "risk factor" is understood "to mean nothing more than a correlate" then it is "trivial" because "it could be cause, it could be consequence." Kleck Dep.,

39

JA0089. Prof. Kleck further notes that "[o]ften in the public health literature, an author will say it's a risk factor and imply that it's a causal factor, because they then draw a conclusion about how you might, in this case, prevent suicide. Well, of course, you can't prevent suicide by eliminating something that's merely coincidentally associated with suicide. It's got to be a factor that has some causal effect." Kleck Dep., JA0090.

In other words, as Prof. Kleck explains, the assertion that access to firearms is "associated" or "correlated" with suicide, "implies that risk factor is a causal factor. Otherwise, it wouldn't make any sense to say, well, you can affect people's likelihood of committing suicide by removing this risk factor." Id. See also Kleck Dep., JA0123-JA0124. If access "has no causal effect, then of course it's not public health concern." Id., JA0133. Studies that rely on correlations to imply a causal connection are, in Dr. Kleck's words, "junk science." Id., JA0278-JA0279, JA0282. That is exactly what the County's literature does here. The expert reports submitted by the County suffer from this fundamental flaw. See Prof. Kleck Rep., JA0477-JA0483. Any implication of causation is factually wrong, thus not "purely factual." The district court addressed none of these issues.

But even assuming *arguendo* that the County's literature was clear in asserting that the access is merely "correlated" with suicide, the literature would still fail scrutiny under *Zauderer*. Fundamentally, the First Amendment does not permit a

governmental entity to compel speech which is justified by mere correlation, especially where (as here) the compelled speech could easily be understood as asserting a causal relationship. Such "correlation speech" cannot be "purely factual" under *Zauderer* because "[e]vidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence." *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir.), *cert. denied*, 562 U.S. 893 (2010).

Again, if the term "risk factor" is understood "to mean nothing more than a correlate" then it is "trivial" because "it could be cause, it could be consequence." Kleck Dep. Tr. at 44, JA0089. There is nothing "purely factual" about information that asserts that something "could be a cause" or "could be [a] consequence." See also *General Electric Co. v. Joiner*, 522 U.S. 136, 143 (1997) (sustaining exclusion of expert report for failure prove causation); *Verisign, Inc. v. XYZ.com LLC*, 848 F.3d 292, 298 (4th Cir. 2017) (affirming district court's exclusion of expert testimony where the expert's data pointed "only to correlation not causation."). The First Amendment does not allow the government to compel "trivial" speech, masquerading as fact.

For example, in *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 800 (2011), the Supreme Court struck down, on First Amendment grounds, a California statute that imposed restrictions and labeling requirements on "violent video games." There, California "acknowledge[ed] that it [could not] show a direct causal link

41

between violent video games and harm to minors," but asserted that "it need not produce such proof because the legislature can make a predictive judgment that such a link exists, based on competing psychological studies." Id. The Supreme Court rejected that argument, holding that studies on which California relied "do not prove that violent video games cause minors to act aggressively (which would at least be a beginning)." Id. Rather, the studies merely were based on "correlation, not evidence of causation" and suffered from other "flaws in methodology." Id.

The County's justifications for the compelled speech at issue here suffer from the same flaws present in *Brown*. Prof. Kleck Rept., JA0477. Plaintiffs relied on *Brown* in the briefing below and yet the district court did not address that decision. Just like California in *Brown*, the County here is justifying the imposition of compelled speech solely on mere evidence of correlation. In sum, the district court's view that a governmental entity may compel speech based on nothing more than a correlation is simply wrong under *Zauderer*.

### 2. The literature is not uncontroversial

The County's assertion that "people" with "access" to firearms "are More at Risk for Suicide than Others" is controversial as is the County's assertion that such access is a "risk factor." Prof. Kleck makes clear that any suggestion that mere access is causal "is probably false." JA0466. That people in the United States are badly divided on the issue of firearms regulation and suicide is so obvious that this Court

42

should take judicial notice of it under Rule 201 of the Federal Rules of Evidence. As Prof. Kleck states, the issue "is indisputably *not* purely factual and uncontroversial information." JA0466-JA0467 (emphasis in original).

The district court did not dispute that reality, opining instead that "[u]ndoubtedly, firearm regulation in the United States is a highly controversial topic," but sought to avoid the controversy by reasoning that *a correlation* between access and suicide was not "controversial." JA1687 (emphasis added). That resort to "correlation" fails. Here, as explained above, fairly read, the County's literature affirmatively states that "people" with mere "access" to firearms "are More at Risk for Suicide than Others." JA0028. Fairly read that statement alone is an expression of causation and, as such, it so unsupported and so controversial that the district court was forced to ignore this language. That was error.

Every plaintiff dealer strongly objected to the messages that the County's literature sends. The district court purported to take note of these objections, but dismissed them, stating that the plaintiffs "did not point to any particular statement in the pamphlet of which they disagreed." JA1684 n.8. That statement is both factually incorrect and legally irrelevant. Plaintiff Field Traders, for example, stated that "[t]he verbiage in the literature 'Some People are More at Risk for Suicide than Others'" … "Environmental Factors" … "Access to lethal means including firearms and drugs' is a claim that just because you own firearms, you are more likely to

43

commit suicide then if you do not own firearms. This statement has been perceived as a statement attempting to sway customers from exercising their Second Amendment right by purchasing firearms and ammunition." JA0399-JA0400. It is hard to get more "particular" than that. But in any event, the district court's insistence on a "particular" statement is wrong as the plaintiffs may properly object to the inferences and "ideological implications" created by the compelled literature. *Greater Baltimore Center*, 879 F.3d at 110.  Indeed, plaintiffs do not need a reason to object at all, other than that they do not wish to be subjected to compelled speech. The right to refrain from speaking is a constitutional right; it needs no justification. Id. See also *Janus*, 138 S.Ct. at 246; *Overbey*, 930 F.3d 222-23.

During the short period (25 days) this Ordinance was in effect before the County suspended enforcement during the pendency of the district court litigation (JA1663), plaintiff Field Traders was forced to deal with customers who expressed "disgust and pause," and who demonstrated "repulsion" at the receipt of this literature. Field Trader Resps. to Interr. 8, JA0399; Field Traders Dep., JA0536-JA0540. Similarly, plaintiff Cindy's Hot Shots explained that the literature would quite likely "tick off" its customers." JA0603-JA0604.

Plaintiff Cindy's Hot Shots also testified that the County's publications on suicide and conflict resolution sends the message that the purchase and possession of firearms and ammunition is causally related to increased risk of suicide and/or the

illegitimate use of firearms and ammunition in conflict resolution." JA0415. Plaintiff Pasadena Arms stated the same, JA0424, as did plaintiff Worth-A-Shot, JA0438, and Cindy's Hot Shots, JA0415. The plaintiff dealers believe that the literature "further sends the message that the customers of such firearms dealers are uniquely in need of the County's message in order to prevent suicide and/or the illegal use of firearms in conflict resolution." JA0425, JA0438. See also Worth-A-Shot Dep., JA0723; Pasadena Dep., JA0665 ("Both pamphlets together give me that feeling" that "this message is against firearms."); id., JA0678 ("it's telling them [customers] they might use that gun on themselves and I don't like that"); Cindy's Hot Shots Dep., JA0613 ("The pamphlet infers that there's a higher risk of suicide with firearms ownership"). These are all fair inferences to be taken from the literature which, after all, expressly states that persons who have mere "access" to firearms "are More at Risk for Suicide than Others." JA0028. Again, the Ordinance is applicable only to firearms dealers and ammunition vendors, and thus only these sellers are required to display the literature and distribute it on every sale.

By compelling the plaintiff dealers to display and distribute the County's literature, the Ordinance violates the First Amendment by forcing the plaintiff dealers either to appear to agree with the County's literature or respond to the County's literature by affirmatively speaking where the plaintiff dealers prefer to remain silent. Worth-A-Shot Dep., JA0720, id., JA1650; Field Traders Dep. Tr.,

JA0523-JA0540; Id., JA0550-JA0551; Cindy's Hot Shots Answer to Interr. 4. JA0411-JA0412 ("Cindy's Hot Shots would prefer to stay silent with respect to suicide prevention and conflict resolution"); id. Answer to Interr. 9, JA4015. As explained above, the First Amendment fully protects the right "not to speak." *Janus*, 138 S.Ct. at 2463; *Overbey*, 930 F.3d at 222. The County's literature infringes that right by not only compelling speech but also by effectively forcing the plaintiff dealers to voice their disagreement lest customers believe that this literature is supported by the dealers. At the very least, the district court failed to accord the dealers any reasonable inference in their reading of the County's literature, as required in summary judgment.

Finally, contrary to the district court's belief, the County's literature does not somehow become less controversial merely because NSSF cosponsored the suicide pamphlet. According to the district court, NSSF's participation "strongly demonstrates the nonpartisan nature of the included information." JA1687. That statement is both wrong and irrelevant. First, compelled speech can easily be "controversial" without being "partisan." Second, as Prof. Kleck explained in his deposition, there is no scientific support for NSSF's views about suicide, and the NSSF undoubtedly cosponsored the pamphlet for its own ends and purposes. Prof. Kleck's Dep., JA0379-JA0380. Third, and in any event, plaintiffs are not bound by the views of the NSSF and may not be subjected to compelled speech just because

some gun trade association has co-published the literature that the County chose to adopt. The County is imposing this speech on the plaintiff dealers, not the NSSF.

## III.  THE EXCLUSION OF PROF. KLECK'S EXPERT REPORT AND TESTIMONY WAS ERROR

The district court refused to consider Prof. Kleck's expert report and testimony, holding that Prof. Kleck's views would not be helpful to the fact finder because his report and testimony was premised on his conclusion that the County's literature asserted a causal connection between access to firearms and suicide. The district court opined that "[f]or Mr. Kleck's expert report to be relevant, this Court must read words into the pamphlet that are not there." JA1684. The court stated that "Mr. Kleck's report would be relevant, and therefore admissible, if the pamphlet indeed asserted a causal link between firearm access and suicide. However, it does no such thing." JA1683. This exclusion of Prof. Kleck was an obvious error.

As is apparent, the exclusion of Prof. Kleck was based solely on the district court's conclusion that "[b]y using the language of 'risk factor' rather than 'cause,' the pamphlet specifically avoids making any causal accusation. By definition, 'risk factors' need not have a causal connection." JA1684. But, as noted above, "by definition" a risk factor "*causes* a person ... to be particularly susceptible to an unwanted ... event." Mosby's Dictionary of Medicine, Nursing & Health Professionals 1634 (8th ed. 2009) (emphasis added). Thus, by using "risk factor" rather than "correlation" the pamphlet is at the very least implicitly asserting a causal

47

connection. That conclusion is further strengthened by the pamphlet's express statement, ignored by the district court, that "people" who have mere "access" to firearms "are More at Risk for Suicide than Others." JA0028.

Lewis Carroll's Humpty Dumpty might disagree,[3] but declaring, *ipse dixit*, that "white" means "black" does not make it so. The district court's ruling is clearly erroneous and thus an abuse of discretion. Specifically, it is "an abuse of discretion to make errors of law or clear errors of factual determination." *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005). See also *In re Lipitor*, 892 F.3d 624, 632 (4th Cir. 2018) ("'If the district court makes an error of law in deciding an evidentiary question, that error is by definition an abuse of discretion. A district court likewise abuses its discretion in deciding a *Daubert* challenge if its conclusion rests upon a clearly erroneous factual finding.'"), quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 228 (4th Cir. 2017).

More fundamentally, on summary judgment, it is a profound abuse of discretion to exclude an expert on grounds that the district court simply did not agree

---

[3] 'When I use a word,' Humpty Dumpty said in rather a scornful tone, 'it means just what I choose it to mean — neither more nor less.'
'The question is,' said Alice, 'whether you can make words mean so many different things.'
'The question is,' said Humpty Dumpty, 'which is to be master — that's all.'

Lewis Carroll, Through the Looking Glass.
https://www.goodreads.com/quotes/12608-when-i-use-a-word-humpty-dumpty-said-in-rather.

with the expert's interpretation of the meaning of the evidence. In refusing to consider Prof. Kleck's report and testimony, the district court failed to accord every fair inference in favor of plaintiffs on the meaning of the language employed by the pamphlets. At the very least, the suicide pamphlet is open to Prof. Kleck's conclusion that it is asserting causal effect. Again, at no point does the pamphlet assert that access to firearms is merely "correlated" with suicide. As noted above, all the plaintiff dealers likewise believe that the County's literature asserts a causal effect.

That evidence matters, particularly on summary judgment. The district court is not the trier of fact on a motion for summary judgment. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [functions of the trier of fact], not those of a judge ... ruling on a motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (brackets in original). A district court errs in its duty to draw "reasonable inferences" in favor of the non-moving party when the court "weigh[s] the evidence and reach[es] factual inferences contrary to [nonmoving party's] competent evidence." *Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (summarily reversing). See also *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000) ("the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the

evidence"); *Summerlin v. Edgar*, 809 F.2d 1034, 1039 (4th Cir. 1987) (holding conflicting testimony as to an issue creates genuine issue of material fact); *Jacobs v. N.C. Admin. Off. of the Cts.,* 780 F.3d 562, 565 n.1 (4th Cir. 2015).

This point applies equally to a district court's review of expert reports. If a reasonable inference can be drawn from the evidence (here the pamphlet), then an otherwise admissible expert report and testimony based on that inference is admissible for consideration by the trier of fact. See, e.g., *In re Bair Hugger Forced Air Warming Devices Products Liability Litigation*, 9 F.4th 768, 779 (8th Cir. 2021) (reversing trial court's exclusion of an expert opinion, holding "we disagree that it is *per se* unreliable for an expert to draw an inference of causation from an epidemiological study that disclaimed proving causation."). Indeed, expert testimony is often based on "inferences." See, e.g., *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Rule 703 of the Federal Rules of Evidence thus provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing."

Prof. Kleck is a renowned scientist and expert on suicide (JA0465-JA0466, JA0489-0515) and his testimony on suicide and the misuse of studies to imply causation from correlation would be useful for any fair and impartial trier of fact in assessing whether the pamphlet is "purely factual" and "uncontroversial," as

50

required by *NIFLA* and *Zauderer*. The district court may not intentionally blind itself to that testimony on a motion for summary judgment where the district court is duty-bound to accord every fair inference to the non-moving party.

## IV. THE DISTRICT COURT ERRED IN FAILING TO GRANT SUMMARY JUDGMENT FOR PLAINTIFFS

In the final analysis, whether the pamphlet asserts a causal effect is relevant to this appeal only if the district court is otherwise correct in its legal analysis in applying *Zauderer* and *NIFLA*. As detailed above, the district court erred in applying *Zauderer*, and that point is enough to decide this case. Under *NIFLA*, the County's content-based, compelled speech is presumptively unconstitutional, and the County bears the burden of showing that its Ordinance is justified under a strict scrutiny standard of review. *Turner Broad. Sys., Inc. v. F.C.C.,* 512 U.S. 622, 642 (1994) ("Laws that compel speakers to utter or distribute speech bearing a particular message are subject to ... rigorous scrutiny."). However, the County quite intentionally made no attempt to do so, arguing instead that it merely needed to satisfy the "rational basis" test of *Zauderer* to prevail. For the reasons detailed above, that reliance on *Zauderer*, accepted by the district court below, fails as a matter of law. Reversal is therefore fully appropriate on that ground alone. There is no need for a remand for a trial. Plaintiffs are entitled to judgment as a matter of law under *NIFLA*. The district court erred in failing to grant summary judgment for plaintiffs.

## CONCLUSION

The judgment below should be reversed, and the case remanded with instructions to enter judgment in favor of plaintiffs on plaintiffs' cross-motion for summary judgment.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
*Maryland Shall Issue, Inc.*
9613 Harford Rd., Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671

May 15, 2023

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-appellants respectfully request oral argument in this appeal. The constitutional issues presented by this case are important and oral argument will likely be beneficial for the Court. Pending before this Court is plaintiffs-appellants' motion to expedite this appeal which the motions panel referred to the merits panel. With each passing day, the First Amendment rights of the plaintiff dealers are sacrificed by the compelled speech required by the County's Ordinance. For the reasons stated in that motion and in this brief, oral argument should be scheduled at the earliest opportunity, and a decision rendered as soon as possible thereafter.

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, the undersigned counsel here certifies that the forgoing Brief of Appellants contains 12, 289 words, not counting those items which may be excluded under Rule 32(f), and uses a 14 point, Times New Roman proportional font.

*/s/ Mark W. Pennak*

Mark W. Pennak,
Counsel for  Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on May 15, 2023, a copy of foregoing Brief of Appellants and a copy of Volumes I, II, and III of the Joint Appendix were served via ECF service to all counsel of record and a copy of Volume IV (SEALED) of the Joint Appendix and the Certificate of Confidentiality was served via email to the following:

Neal Kumar Katyal
William Ernest Havemann
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004-1109
neal.katyal@hoganlovells.com
will.havemann@hoganlovells.com

Hamilton F. Tyler
Tamal Ajani Banton
ANNE ARUNDEL COUNTY OFFICE OF LAW
4th Floor, 2660 Riva Road
Annapolis, MD 21401-0000
htyler@aacounty.org
tbanton@aacounty.org
*Counsel for Defendant-Appellee*