No. 23-1351

IN THE

# United States Court of Appeals for the Fourth Circuit

MARYLAND SHALL ISSUE, INC., *et al.*,

*Plaintiffs-Appellants*,

v.

ANNE ARUNDEL COUNTY, MARYLAND,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Maryland, No. 22-cv-865 (Gallagher, J.)

**APPELLEE'S RESPONSE BRIEF**

GREGORY J. SWAIN
  County Attorney
HAMILTON F. TYLER
  Deputy County Attorney
TAMAL A. BANTON
  Senior Assistant County Attorney
ANNE ARUNDEL COUNTY OFFICE OF LAW
2660 Riva Road, 4th Floor
Annapolis, Maryland 21401
(410) 222-7888



July 10, 2023

NEAL KUMAR KATYAL
WILLIAM E. HAVEMANN
SIMON CHIN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
neal.katyal@hoganlovells.com

ERIC TIRSCHWELL
JAMES MILLER
NINA SUDARSAN
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8222

*Counsel for Appellee*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES FOR REVIEW ...................................4

STATEMENT OF THE CASE..............................................................4

    I.    FACTUAL BACKGROUND.........................................................4

    II.    PROCEDURAL HISTORY..........................................................10

SUMMARY OF THE ARGUMENT ...................................................15

STANDARD OF REVIEW ................................................................17

ARGUMENT ...................................................................................18

    I.    THE ORDINANCE COMPORTS WITH THE FIRST AMENDMENT ...................18

        A.    The Ordinance Requires A Disclosure In The Context Of Commercial Speech And Is Therefore Subject To Review Under *Zauderer* ...........................................................18

            1.    *The Ordinance Is A Commercial Disclosure Requirement* ...................................................18

            2.    *The Ordinance Is Not Subject To Strict Scrutiny* ...............22

        B.    The Ordinance Satisfies *Zauderer* .................................27

            1.    *The Ordinance Advances A Weighty Government Interest* ...........................................................28

            2.    *The Ordinance Requires Disclosure Of Purely Factual And Uncontroversial Information* .........................30

            3.    *The Ordinance Is Reasonably Tailored And Not Unduly Burdensome* ...........................................39

**TABLE OF CONTENTS—Continued**

Page

C.    Plaintiffs' Arguments Would Call Into Question Scores
Of Commercial Disclosure Requirements ......................................43

1.    *Commercial Health And Safety Disclosures,
Including About Firearms, Are Ubiquitous* ........................43

2.    *Plaintiffs Cannot Distinguish The Ordinance From
Other Longstanding Compelled Commercial
Disclosures* ..........................................................................46

II.   THE DISTRICT COURT PROPERLY EXCLUDED THE REPORT OF
PLAINTIFFS' EXPERT ...................................................................47

CONCLUSION .........................................................................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  760 F.3d 18 (D.C. Cir. 2014) (en banc).................................................29, 30, 44

*Art & Antique Dealers League of Am., Inc. v. Seggos*,
  394 F. Supp. 3d 447 (S.D.N.Y. 2019) ...............................................................22

*Board of Trustees of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989)............................................................................................19

*Brown v. Entertainment Merchants Ass'n*,
  564 U.S. 786 (2011)............................................................................................36

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980)......................................................................................19, 20

*CTIA - The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019) ......................................................................*passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)............................................................................................15

*Discount Tobacco City & Lottery, Inc. v. United States*,
  674 F.3d 509 (6th Cir. 2012) .............................................................................30

*Dorman v. Annapolis OB-GYN Assocs., P.A.*,
  781 F. App'x 136 (4th Cir. 2019) ......................................................................49

*Fla. Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995)............................................................................................28

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)............................................................................................49

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City
  Council of Baltimore*,
  721 F.3d 264 (4th Cir. 2013) (en banc) ("*Greater Baltimore I*").....16, 20, 21, 27

iii

**TABLE OF AUTHORITIES—Continued**

Page(s)

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*,
879 F.3d 101 (4th Cir. 2018) ("*Greater Baltimore II*")................................20, 21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995)...............................................................................22, 25

*Ibanez v. Fla. Dep't of Bus. & Pro. Regul.*,
512 U.S. 136 (1994).................................................................................1, 43

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
138 S. Ct. 2448 (2018)..............................................................................22

*McKiver v. Murphy-Brown, LLC*,
980 F.3d 937 (4th Cir. 2020) ....................................................................48

*Meese v. Keene*,
481 U.S. 465 (1987)..................................................................................39

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) .....................................................................30

*National Institute of Family & Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018)...................................................................... *passim*

*Pharm. Care Mgmt. Ass'n v. Rowe*,
429 F.3d 294 (1st Cir. 2005)......................................................................30

*Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*,
686 F.3d 889 (8th Cir. 2012) (en banc) ...........................................34, 35, 36, 38

*Recht v. Morrisey*,
32 F.4th 398 (4th Cir. 2022) ...........................................................*passim*

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)..................................................................................22

*United States v. Ancient Coin Collectors Guild*,
899 F.3d 295 (4th Cir. 2018) ..........................................................17, 18, 48

iv

## TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Carter,*
   750 F.3d 462 (4th Cir. 2014) ........................................................35

*United States v. Dorsey,*
   45 F.3d 809 (4th Cir. 1995) ...........................................................49

*United States v. Iskander,*
   407 F.3d 232 (4th Cir. 2005) .........................................................48

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
   471 U.S. 626 (1985) ................................................................. *passim*

**STATUTES:**

15 U.S.C. § 1472 ...............................................................................44

15 U.S.C. § 2056e(a)(2) ....................................................................44

27 U.S.C. § 215 .................................................................................44

Fla. Stat. § 790.175 ....................................................................45, 46

N.C. Gen. Stat. § 14-315.2 ...............................................................45

N.C. Gen. Stat. § 143-443(a)(3) .......................................................44

S.C. Code Ann. § 23-39-20 ...............................................................44

Tex. Penal Code Ann. § 46.13(g) .....................................................46

Va. Code Ann. § 18.2-320 ................................................................44

Va. Code Ann. § 32.1-133.1 .............................................................45

Va. Code Ann. § 40.1-11.3 ...............................................................45

W.V. Code § 15A-2-5 .......................................................................45

**REGULATIONS:**

16 C.F.R. § 1500.19(b) .....................................................................44

**TABLE OF AUTHORITIES—Continued**

Page(s)

21 C.F.R. § 201.100(d) ...................................................................44

21 C.F.R. § 1040.20(d)(1)...............................................................44

27 C.F.R. § 478.103 ........................................................................45

40 C.F.R pt. 156 ..............................................................................44

ADMINISTRATIVE MATERIAL:

12 Va. Admin. Code § 421-930 .......................................................45

OTHER AUTHORITIES:

*Fast Facts: Firearm Violence Prevention*, CDC,
    https://www.cdc.gov/violenceprevention/firearms/fastfact.html (last
    updated May 4, 2022) ...............................................................4

http://fieldtraders.com/ (last visited July 10, 2023) ...................11

Amanda I. Mauri *et al.*, *Firearm Storage Practices and Risk Perceptions*,
    57 Am. J. Preventive Med. 830 (2019).................................47, 48

Pasadena Arms, Facebook (May 7, 2023),
    https://www.facebook.com/permalink.php?story_fbid=579020650875
    414&id=100063024532099 (last visited July 10, 2023) ...................11

Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867
    (2015)..............................................................................30, 43

*Risk Factor*, Black's Law Dictionary (11th ed. 2019)............................31

Sabrina Tavernise *et al.*, *5 People Dead in Shooting at Maryland's
    Capital Gazette Newsroom*, N.Y. Times (June 28, 2018),
    https://www.nytimes.com/2018/06/28/us/capital-gazette-annapolis-
    shooting.html ............................................................................6

**INTRODUCTION**

To combat a growing crisis of gun suicides and other gun violence, Anne Arundel County, Maryland enacted a commonsense commercial disclosure law ("the Ordinance") requiring gun stores to display and distribute information to gun buyers warning about the risk of suicide and promoting nonviolent conflict resolution. To ensure that the Ordinance would not be misperceived as conveying an anti-gun message, the County used a pamphlet coauthored by the National Shooting Sports Foundation ("NSSF"), which is the gun industry's principal trade group. The pamphlet is factually accurate and utterly uncontroversial: It lists more than a dozen risk factors for suicide substantiated by an overwhelming body of social science, identifies suicide warning signs, encourages safe firearm storage, and lists national suicide-prevention resources. NSSF encourages gun stores to distribute the pamphlet because doing so "can help save lives." JA836.

As the District Court found, the Ordinance provides for precisely the kind of health and safety disclosure about commercial products that the Supreme Court and this Court have repeatedly endorsed. Health and safety disclosures are a staple of American commercial life, reflecting that "disclosure of truthful, relevant information" regarding commercial products "is more likely to make a positive contribution to decisionmaking than is concealment of such information." *Ibanez v. Fla. Dep't of Bus. & Pro. Regul.*, 512 U.S. 136, 142 (1994) (quotation marks

1

omitted).  The Ordinance easily survives the First Amendment scrutiny applicable to commercial disclosures because it involves purely factual and uncontroversial information, is minimally burdensome, and is reasonably tailored to advance the exceptionally weighty government interest of preventing gun suicides and violence.

Plaintiffs' First Amendment argument rests on glaring distortions of controlling precedent.  Plaintiffs assert that the Ordinance must survive strict scrutiny, disregarding this Court's repeated holdings that mandatory disclosures of commercial speech are subject to scrutiny the Court has likened to rational-basis review.  Plaintiffs rely almost exclusively on the Supreme Court's decision in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2367 (2018) ("*NIFLA*"), but they ignore *NIFLA*'s assurance that the Court did "not question the legality of health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products." *Id.* at 2376.

Plaintiffs also misread the pamphlets subject to disclosure under the Ordinance.  Plaintiffs mischaracterize the suicide-prevention pamphlet to convey the message that access to guns causes suicide, but the pamphlet instead simply includes access to lethal means like drugs and firearms among a list of more than a dozen suicide "risk factors."  Describing access to guns as a suicide risk factor is unequivocally true and is echoed by every major American public-health authority,

which describe access to firearms as a suicide "risk factor" using identical language. As for Plaintiffs' assertion that the pamphlet is controversial, nothing refutes that assertion better than the pamphlet's authorship by the gun industry itself. As the District Court recognized, guns are controversial in some respects, but preventing gun suicides and violence is not. The Ordinance emphatically does not convey an anti-gun message or force gun stores to take sides in the American debate over gun safety. Plaintiffs' contrary argument asks this Court to reach the astonishing conclusion that the gun industry has drafted a pamphlet encouraging consumers not to buy guns.

Even the most modest understanding of Plaintiffs' scattershot arguments would upend the law of commercial speech. Innumerable laws at the federal, state, and local levels require disclosures to promote public health and ensure the safe use of commercial products. These include disclosures familiar to every American—nutrition facts, drug label warnings, warnings about alcohol, children's toys, batteries, and scores of other potentially dangerous products. Indeed, other federal and state laws require disclosures with respect to firearms themselves. Plaintiffs make no meaningful effort to distinguish the Ordinance from these ubiquitous commercial disclosure requirements, and Plaintiffs' argument, if accepted, would call into question scores of laws across the United States. This Court should affirm the District Court's thorough decision rejecting Plaintiffs' challenge.

## STATEMENT OF THE ISSUES FOR REVIEW

1.  Whether the Ordinance complies with the First Amendment.

2.  Whether the District Court correctly excluded the report and testimony of Plaintiffs' expert.

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

1.  Gun violence is a public health emergency.  In 2020—the most recent year for which comprehensive data was available when this lawsuit began—firearm-related deaths reached the highest level ever recorded by the Centers for Disease Control and Prevention ("CDC").  JA734.  More than 45,000 people died by firearm in the United States in 2020—on average, more than 120 firearm deaths per day. *See Fast Facts: Firearm Violence Prevention*, CDC, https://www.cdc.gov/violenceprevention/firearms/fastfact.html (May 4, 2022).

Guns are the most common means of both homicide and suicide in the United States.  JA734.  Nearly 80% of nationwide homicides in 2020 involved firearms, including deaths from mass shootings that have become an almost daily tragedy.  *Id.* Most firearm-related deaths, however, are deaths by suicide.  *Id.*  In 2020, 24,292 suicides—53% of total suicides nationwide—involved the use of a firearm, nearly double the second most common method of suicide.  JA774.

4

Access to guns poses such a significant suicide risk for two related reasons. First, guns are generally more lethal than other means of suicide. JA735. Suicidal acts involving firearms are lethal approximately 90% of the time. *Id.* By contrast, for example, suicidal acts involving poisoning are lethal approximately 5% of the time. *Id.* A person who attempts suicide using a gun is generally more likely to die from the attempt than a person who attempts suicide using a different method. *Id.* The disparity in lethality is so substantial that guns are by far the leading method of death by suicide even though guns are used in less than 10% of suicide attempts. *Id.*

Second, suicide attempts tend to be impulsive acts in moments of acute crisis. *Id.*; JA875. More than half of the people who make near-lethal suicide attempts do so within an hour of their decision to attempt suicide. JA735. As a result, the lethality of the immediately available means of suicide plays a significant role in determining whether the act will be fatal. People who have a gun readily available when they make the impulsive decision to attempt suicide are more likely to die than those who do not. *Id.* And the overwhelming majority of people who survive a suicide attempt do not die by suicide from a later attempt. JA777.

These features of suicide have led public-health authorities to focus on a strategy known as "lethal means reduction." *Id.* As the CDC explains, because "the interval between deciding to act and attempting suicide can be as short as 5 or 10 minutes," and because "people tend *not* to substitute a different method when a

highly lethal method is unavailable or difficult to access," efforts to make it "more difficult to access lethal means" during a crisis "can be lifesaving." JA875. The CDC therefore recommends "education and counseling around storing firearms locked in a secure place," which "can reduce the risk for suicide by separating vulnerable individuals from easy access to lethal means." *Id.*

2.   Anne Arundel County, Maryland ("the County"), has been particularly affected by the scourge of gun violence. In 2018, a mass shooting at Annapolis's Capital Gazette newspaper killed five people, wounded two others, and terrorized the community. *See* Sabrina Tavernise *et al.*, *5 People Dead in Shooting at Maryland's Capital Gazette Newsroom*, N.Y. Times (June 28, 2018), https://www.nytimes.com/2018/06/28/us/capital-gazette-annapolis-shooting.html. As in the nation more broadly, firearms are the leading means of suicide in the County, accounting for nearly half of all suicides in the County over the last three years. JA774.

In April 2019, in the aftermath of the Capital Gazette shooting, the Anne Arundel County Executive issued an executive order creating the Anne Arundel County Gun Violence Prevention Task Force. JA772. The task force was charged with researching how the public-health system could be used to prevent gun violence and recommending "actionable proposals to reduce gun violence in this county." JA773. In June 2020, the task force issued its final report with numerous

6

recommendations, one of which was to form the County's Gun Violence Intervention Team, a permanent multiagency group that launched in August 2020. *Id.* The Intervention Team has published numerous community resources to prevent gun violence, and has released a strategic plan to reduce gun violence through data collection, education, public awareness, violence interruption, and coordinating interventions across the County. *Id.*

On January 3, 2022, as part of the County's broader gun-violence-prevention initiative, the Anne Arundel County Council passed the Ordinance at issue in this appeal, titled *Public Safety—Distribution of Literature to Purchasers of Guns or Ammunition*. JA789-790. The Ordinance requires the Anne Arundel County Department of Health to "prepare literature relating to gun safety, gun training, suicide prevention, mental health, and conflict resolution," and to distribute this literature to stores in the County that "sell guns or ammunition." JA789 (capitalization altered). The Ordinance also requires gun dealers to distribute this public-safety literature to "purchasers" of firearms and ammunition, and to display this literature "at the point of sale." JA790 (capitalization altered).

The County Department of Health implemented the Ordinance by distributing to sellers of guns and ammunition in the County two documents, which sellers must display and provide to purchasers.

7

*Suicide Prevention Pamphlet*:  The first document is a pamphlet entitled "Firearms and Suicide Prevention."  JA792-799.  The County did not author this pamphlet.  Instead, the County used a pamphlet created in a collaboration between the American Foundation for Suicide Prevention ("AFSP"), a leading national nonprofit suicide-prevention organization, and the National Shooting Sports Foundation, the "firearm industry trade association."  JA799; JA803.  These two organizations developed the pamphlet as a resource "to help firearms retailers, shooting range operators and customers understand risk factors and warning signs related to suicide, know where to find help and encourage secure firearms storage options."  JA836.  The organizations ask retailers and ranges to distribute the material to customers, "because doing so can help save lives."  *Id.*

The pamphlet is six-by-six inches and contains six pages of content.  One page contains the heading "What Leads to Suicide?" followed by a paragraph that begins "There's no single cause" and does not mention guns.  JA793.  Other pages identify suicide warning signs, JA796; offer guidance about how to protect someone at risk of suicide, JA797; provide options for safely storing firearms like cable locks as well as estimated costs for each option, JA798; and list national suicide-prevention resources, JA799.

One page of the pamphlet states that "Some People are More at Risk for Suicide than Others," then lists more than a dozen "risk factors" for suicide across

three categories—health, environmental, and historical factors. JA795. The pamphlet states "[r]isk factors are characteristics or conditions that increase the chance that a person may try to take their life." *Id.* The listed risk factors include: a range of mental health conditions such as depression and bipolar disorder; serious or chronic health conditions or pain; stressful life events; prolonged stress; exposure to another person's suicide; access to lethal means including firearms and drugs; previous suicide attempts; family history of suicide; and childhood abuse, neglect or trauma. *Id.*

The pamphlet's characterization of access to lethal means such as firearms as a "risk factor" for suicide reflects an overwhelming public-health consensus. The National Institutes of Health ("NIH") includes among the "main risk factors for suicide" the "[p]resence of guns or other firearms in the home." JA915. The CDC states that "Societal Risk Factors" for suicide include "[e]asy access to lethal means of suicide among people at risk." JA937. The Maryland Department of Health likewise includes among "Risk Factors of Suicide" "[e]asy access to lethal means" such as "firearms, medications." JA923. This public-health consensus builds from decades of research confirming that ready access to a firearm leads to an "increased risk" that a person in crisis will commit suicide. *E.g.*, JA1181; JA1297; JA1383; JA1427.

By using a pamphlet coauthored by NSSF, the County sought to ensure that the material contained in the pamphlet would not be misperceived as conveying an anti-gun message. NSSF describes itself as "lead[ing] the way in advocating for the [firearm] industry," and "relentlessly advocat[ing] for measures on behalf of" and "in defense of the firearm and ammunition industry at all levels and before all branches of government." JA803; JA806.

*Conflict-Resolution Insert*: The second document is a six-by-six-inch, one-page insert produced by the County that provides County-specific resources for conflict resolution. JA800. This insert states: "Conflict Resolution is a process to help you find the best way to resolve conflicts and disagreements peacefully." *Id.* The insert then provides contact information for a County conflict resolution center, a "Warmline" for County residents in crisis, a Veteran's Crisis Line, as well as a link to the County's suicide-prevention toolkit. *Id.*

## II. PROCEDURAL HISTORY

1. Shortly after the County enacted the Ordinance, a Maryland-based guns-rights organization and four gun stores in the County (collectively, "Plaintiffs") brought this lawsuit alleging that the Ordinance violates the First Amendment. Plaintiffs sought an injunction preventing enforcement of the Ordinance. After

10

Plaintiffs filed suit, the County agreed not to enforce the Ordinance against any gun

retailer until the District Court decided the case on the merits.[1]

During discovery, the County commissioned two expert reports.  The first

report, authored by Dr. Alexander McCourt, a professor of public health at Johns

Hopkins University, describes the connection between firearms and suicide and

concludes that the "pamphlets provided by Anne Arundel County are accurate and

likely to help facilitate secure storage and safe practices among gun owners, thereby

helping to reduce firearm-related deaths."  JA737.  The second report, authored by

Dr. Nilesh Kalyanaraman, at the time the Anne Arundel County Health Officer,

contextualizes the Ordinance within the County's broader gun-violence-prevention

efforts, explains that "[l]ethal means reduction reflects the scientific consensus on

how to decrease the chances of death from a suicide attempt," JA777, and concludes

that the "distribution of suicide prevention literature by gun dealers is an effective

method to reduce suicide by firearms."  JA779.  During discovery, the County also

identified 44 peer-reviewed studies published in some of the nation's premier social-

---

[1] Two of the four plaintiff gun stores appear to have closed during the pendency of this litigation for reasons unrelated to the challenged Ordinance.  *See* http://fieldtraders.com/ (last visited July 10, 2023) ("Field Traders LLC is permanently closed"); Pasadena Arms, Facebook (May 7, 2023), https://www.facebook.com/permalink.php?story_fbid=579020650875414&id=100063024532099 (last visited July 10, 2023) (Pasadena Arms social media post stating "Sorry everyone but have had to close the store").

science journals supporting the conclusion that access to firearms is a suicide risk factor.  JA1155-1611.

Plaintiffs retained one expert, Dr. Gary Kleck, a retired professor of criminology who has offered expert testimony in at least 20 prior cases challenging gun safety laws but has never testified in support of such laws.  Much of Professor Kleck's report was copied verbatim from a book chapter he authored in 2019.  *Compare* JA468-483, *with* JA1066-83.  Professor Kleck's report began by assuming that the pamphlet's description of access to firearms as a suicide "risk factor" meant that the County was "claiming that access to firearms *causes* an increased chance of a person committing suicide."  JA466 (emphasis added).  Professor Kleck then disputed what he understood to be the pamphlet's causal claim.  Professor Kleck conceded, however, that if the pamphlet merely asserted a "noncausal correlation or association" between guns and suicide, the pamphlet was accurate.  JA93.

2.  The District Court issued a thorough opinion rejecting Plaintiffs' First Amendment challenge and granting summary judgment for the County.  The District Court recognized that content-based laws "are presumptively unconstitutional," but explained that laws regulating "commercial speech" are subject to more relaxed First Amendment scrutiny.  JA1675-76.  Under the Supreme Court's decision in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 628 (1985), a law requiring disclosure "of purely factual and uncontroversial information

about a commercial product" comports with the First Amendment if the disclosure requirement is "reasonably related" to a sufficiently weighty state interest. JA1676.

The District Court concluded that the Ordinance mandates a quintessential health-and-safety warning about commercial products and complies with the First Amendment. The Ordinance "plainly encompasses commercial speech" given that it regulates only "commercial retailers" at the "point of sale" and "relates to the safe handling of the purchased product." JA1678. As the court explained, "[p]roviding information to promote the responsible use of a firearm is akin to commonplace laws requiring information regarding the safe use" of other potentially dangerous products like drugs or children's toys. *Id.*

The court then concluded that the pamphlet conveys factual and uncontroversial information. The pamphlet's characterization of access to firearms as a "risk factor" for suicide is "purely factual information" that is "well-documented." JA1686-1687. And although "firearm regulation in the United States is a highly controversial topic," the "pamphlets themselves only speak to the uncontroversial topics of suicide prevention and nonviolent conflict resolution." JA1687. As the court explained, that "the firearm industry's trade association" coauthored the suicide-prevention pamphlet "strongly demonstrates" the uncontroversial nature of the information conveyed. *Id.*

The court also found that the pamphlets are "reasonably related" to the State's interest in preventing suicide and violence and are "not unduly burdensome." JA1688 (quotation marks omitted).  Gun stores' obligations under the Ordinance are "minimal," and the "proven correlation between gun access and suicide risk presents the County an opportunity to target its informational outreach more accurately." *Id.* The Court concluded that "this case is not about limiting gun ownership or stigmatizing firearms" but instead about the "link between access to firearms and the risk of suicide or violent conflict resolution, and about the County's ability to take reasonable steps to mitigate that risk."  JA1689.

In granting summary judgment for the County, the District Court excluded Professor Kleck's report, reasoning that his conclusions were not relevant.  As the court explained, the report was premised on the assumption that the pamphlet asserts a causal connection between access to guns and suicide.  The "report would be relevant, and therefore admissible, if the pamphlet indeed asserted a causal link between firearm access and suicide." JA1683.  But the pamphlet merely "identifies access to firearms and other lethal means as a 'risk factor,' and nothing more."  *Id.* Because Professor Kleck's "expert opinion does not dispute the correlation between access to firearms and risks of suicide," the court reasoned that the report "is not 'sufficiently tied to the facts of the case such that it will aid the jury in resolving a

factual dispute." JA1685 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (alteration omitted)).

Plaintiffs appealed and moved to expedite the appeal. This Court deferred consideration of the motion to expedite pending assignment of the case to a panel. *See* Dkt. 16.

## SUMMARY OF THE ARGUMENT

**I.** The District Court's decision upholding the Ordinance was correct in every respect, and this Court should affirm.

**A.** The Ordinance imposes a quintessential disclosure requirement in the context of commercial speech. By its terms, the Ordinance regulates stores that "sell" guns or ammunition to "purchasers," and requires disclosure only at the "point of sale." JA789-790 (capitalization altered). The Ordinance thus applies in the context of commercial transactions and requires disclosure pertaining to the very products being sold. While Plaintiffs rely heavily on *NIFLA* in claiming that the Ordinance does not regulate commercial speech, Plaintiffs fail to acknowledge *NIFLA*'s explicit affirmation that laws requiring "health and safety warnings" or "disclosures about commercial products" are reviewed under the standard for commercial speech. 138 S. Ct. at 2376.

**B.** Because the Ordinance imposes a commercial disclosure requirement, it is subject to review under the deferential *Zauderer* standard, which authorizes

15

commercial disclosure of "purely factual and uncontroversial information" if the disclosure advances sufficiently weighty state interest, is reasonably tailored, and is not "unduly burdensome." *Recht v. Morrisey*, 32 F.4th 398, 416, 418 (4th Cir. 2022) (quoting *Zauderer*, 471 U.S. at 651).

The Ordinance easily satisfies that standard, which this Court has likened to "rational basis scrutiny." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc) ("*Greater Baltimore I*"). Because the Ordinance combats a crisis of gun violence and suicides, it advances the weightiest imaginable government interest. The Ordinance requires the disclosure of purely factual information that is supported by a virtually unanimous body of public-health scholarship. The material at issue is uncontroversial, as confirmed by the fact that it was coauthored by the gun industry's own trade association. The disclosure is reasonably tailored given that lethal means reduction "reflects the scientific consensus on how to decrease the chances of death from a suicide attempt." JA777. And the Ordinance is not unduly burdensome because there is no risk the Ordinance will make other commercial speech functionally impossible and the County bears the expense of furnishing the material.

**C.** Commercial disclosure requirements like the Ordinance are ubiquitous in American life. Federal and state laws impose disclosure requirements on firearms dealers much like the requirement imposed by the Ordinance. Outside the firearms

16

context, laws at the federal, state, and local levels impose countless commercial disclosure requirements to ensure that consumers are informed about the safe use of potentially dangerous or unhealthy products. Plaintiffs' various theories—that *Zauderer* applies only to service providers, that commercial disclosure requirements are only permissible to prevent deceptive advertising, that any warning about the risks of a product implies the product is bad—would call these ubiquitous disclosure laws into question and would upend the law of commercial speech.

**II.** The District Court did not err, let alone abuse its discretion, in excluding the report of Plaintiffs' expert. Professor Kleck's opinion began from the premise that one phrase on one page of the suicide-prevention pamphlet describing access to firearms as a suicide "risk factor" asserted that guns cause suicide. But the pamphlet does not state that guns cause suicide, and its "risk factor" language invokes association rather than causation. The District Court correctly concluded that Professor Kleck's straw-man attacks on language the pamphlet does not use was not relevant. In any event, exclusion of the report was harmless, and Professor Kleck's report was excludable on multiple other grounds.

## STANDARD OF REVIEW

This Court reviews a district court's award of summary judgment de novo. *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 312 (4th Cir. 2018).

This Court reviews the decision to exclude expert evidence at summary judgment "for an abuse of discretion." *Id.* at 318.

## ARGUMENT

### I.   THE ORDINANCE COMPORTS WITH THE FIRST AMENDMENT.

The Ordinance imposes the precise type of public health and safety disclosure about commercial products that this Court and the Supreme Court have emphatically endorsed. As the District Court concluded, because the Ordinance imposes a disclosure requirement in the context of commercial speech, it is subject to review under *Zauderer*. And the Ordinance easily satisfies *Zauderer* because it requires disclosure of factual and uncontroversial information with respect to the exceptionally weighty government interest of preventing gun suicides and violence, is reasonably tailored, and is not unduly burdensome.

### A.   The Ordinance Requires A Disclosure In The Context Of Commercial Speech And Is Therefore Subject To Review Under *Zauderer*.

1. *The Ordinance Is A Commercial Disclosure Requirement.*

Legislatures have long required commercial actors to disclose information to consumers through warning labels and product disclosures. For almost two centuries, such regulation of commercial speech "was understood to fall outside of the First Amendment's ambit." *Recht*, 32 F.4th at 407. Commercial speech is now understood to be constitutionally protected, with the recognition that the First

Amendment "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). This Court and the Supreme Court have emphasized "commercial speech's 'subordinate position in the scale of First Amendment values' and the government's correspondingly 'ample scope of regulatory authority' in the commercial speech realm." *Recht*, 32 F.4th at 407-408 (quoting *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989)).

Courts evaluate regulations that impose *prohibitions* on corporate speech differently than regulations that impose commercial *disclosure* requirements. "The Supreme Court has made clear that there are 'material differences between disclosure requirements and outright prohibitions on speech.'" *Id.* at 416 (quoting *Zauderer*, 471 U.S. at 651). The "extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides." *Zauderer*, 471 U.S. at 651. For that reason, commercial "disclosure requirements trench much more narrowly" on First Amendment interests "than do flat prohibitions on speech." *Id.*

Laws that prohibit commercial speech are subject to intermediate scrutiny, *see Central Hudson*, 447 U.S. at 563, while laws that impose disclosure requirements in the commercial context are subject to more deferential review under the standard set

forth in *Zauderer*. "*Zauderer* generally applies to the mandatory disclosure of commercial speech." *Recht*, 32 F.4th at 416.

Because the Ordinance undisputedly provides for a disclosure rather than a prohibition on speech, application of *Zauderer* turns on whether the Ordinance regulates commercial speech. Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Recht*, 32 F.4th at 407 (quoting *Central Hudson*, 447 U.S. at 561). It encompasses, but is not limited to, "speech that does no more than propose a commercial transaction." *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 108 (4th Cir. 2018) ("*Greater Baltimore II*") (quoting *Greater Baltimore I*, 721 F.3d at 284). The Supreme Court recently confirmed that laws requiring "disclosures about commercial products" involve commercial speech. *NIFLA*, 138 S. Ct. at 2376. Where commercial-speech status is disputed, this Court evaluates the "context" of the regulation, including factors such as whether the speech is an "advertisement," whether the speaker has "an economic motivation for the speech," and whether the speech refers to "a specific product or service." *Greater Baltimore II*, 879 F.3d at 108 (quoting *Greater Baltimore I*, 721 F.3d at 285, 286).

As the District Court concluded, the Ordinance "plainly" regulates commercial speech. By its express terms, the Ordinance regulates only

"establishments that *sell* guns or ammunition." JA789-790 (emphasis added and capitalization altered). The Ordinance requires sellers to display pamphlets "at *the point of sale*." JA790 (emphasis added and capitalization altered). And the Ordinance requires sellers to distribute the pamphlets to "*purchasers* of guns or ammunition." *Id.* (emphasis added and capitalization altered). The Ordinance thus regulates retailers who "propose a commercial transaction," the quintessential test for commercial speech. *Greater Baltimore II*, 879 F.3d at 108 (quoting *Greater Baltimore I*, 721 F.3d at 284).

This Court's decision in *Greater Baltimore II* confirms that the Ordinance regulates commercial speech. There, the Court held that a Baltimore ordinance requiring "a non-profit Christian organization" to post a notification in its waiting room that it does "not provide or make referral for abortion or birth-control services" did not regulate commercial speech. *Id.* at 106 (quotation marks omitted). This Court emphasized that the plaintiff's services were "free"—that is, the plaintiff collected "*no remuneration of any kind*." *Id.* at 108 (emphasis added). Further, the plaintiff proposed no "transactions in the waiting room where the disclaimer would appear." *Id.* And the plaintiff harbored no "economic motivation" for providing its services because it was "a non-profit organization whose clearest motivation is not economic but moral, philosophical, and religious." *Id.* at 109 (quotation marks omitted).

In contrast, the Ordinance here regulates retailers who engage in quintessential commercial transactions; the retailers collect remuneration for each transaction; the retailers have an economic motivation for the transactions; and Plaintiffs propose the transactions in the same location where the Ordinance requires the disclosure to be made. *See Art & Antique Dealers League of Am., Inc. v. Seggos*, 394 F. Supp. 3d 447, 459 (S.D.N.Y. 2019) ("Because the in-store display of [commercial] products proposes a commercial transaction, such a display constitutes commercial speech."). The Ordinance regulates commercial speech, and the question is not close.

2. *The Ordinance Is Not Subject To Strict Scrutiny.*

Plaintiffs stake their case on the premise that the Ordinance should be subject to strict scrutiny rather than *Zauderer*'s more deferential standard for commercial disclosure requirements. Plaintiffs' arguments for strict scrutiny are meritless.

*First*, Plaintiffs (at 13-14) cite decisions applying strict scrutiny to laws that mandate compelled speech. But none of these cases involved commercial speech. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 579 (1995) (invalidating "a noncommercial speech restriction"); *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2465 (2018) (this "is not commercial speech" (quotation marks omitted)); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) (speech at issue lacked "commercial

character"). None of these cases calls into question precedent holding that "commercial speech can be subjected to modes of regulation that might be impermissible in the realm of non-commercial expression." *Recht*, 32 F.4th at 407-408 (quotation marks omitted). And Plaintiffs cite nothing in the record suggesting that the Ordinance prevents them from engaging in any non-commercial speech.

In *Recht*, this Court rejected a similar attempt to import noncommercial strict-scrutiny cases into the commercial-speech context. As the Court explained, "each of these cases arose in a different context," and these cases thus "cannot be distorted to so unsettle" the commercial-speech doctrine. 32 F.4th at 408-409.

*Second*, Plaintiffs rely heavily on the Supreme Court's decision in *NIFLA*. Plaintiffs argue (at 17) that *NIFLA* limited "*Zauderer* to its facts" and held that *Zauderer* is limited to disclosures of purely factual and uncontroversial information about the terms under which "*services will be available*."

Plaintiffs omit the relevant portion of *NIFLA*. The Supreme Court in *NIFLA* reaffirmed the legality of "health and safety warnings long considered permissible." 138 S. Ct. at 2376. And, in a passage Plaintiffs fail to cite, *NIFLA* reaffirmed the legality of mandating "purely factual and uncontroversial disclosures *about commercial products*." *Id.* (emphasis added). *NIFLA* therefore accepted that laws requiring health and safety disclosures "about commercial products" involve commercial speech, and did "not question" the precedent upholding such laws if

they satisfy *Zauderer*—that is, if they are "purely factual and uncontroversial," reasonably tailored, and not unduly burdensome. *Id.* Plaintiffs simply omit this portion of *NIFLA*.

Contrary to Plaintiffs' assertion, the Ordinance bears no resemblance to the law invalidated in *NIFLA*. That law regulated "crisis pregnancy centers" that offered certain "free" services for pregnant women, requiring these clinics to inform all patients that the state provides free or low-cost access to abortion. *Id.* at 2368. The Court held that the law did not regulate commercial speech and that *Zauderer* did not apply because the disclosure "in no way relates to the services that licensed clinics provide" and instead "requires these clinics to disclose information about *state*-sponsored services." *Id.* at 2372.

Nothing about that reasoning applies here. Unlike in *NIFLA*, the Ordinance regulates stores that sell commercial products rather than providing free services, and the Ordinance requires disclosure about safe use of the very products at issue in the commercial transaction. The Ordinance mandates exactly the kind of health-and-safety disclosure "about commercial products" that *NIFLA* endorsed. *Id.* at 2376.

Plaintiffs (at 20-21) emphasize *NIFLA*'s statement that *Zauderer* did not apply because the disclosure was not limited to information about the terms under which "services will be available." But the Court in *NIFLA* had every reason to focus on

24

the terms under which services would be available, because the case involved a service provider. Nothing about *NIFLA*'s reference to services limits the commercial-speech doctrine to businesses that offer services rather than selling products, as *NIFLA* itself made clear in holding that disclosures "about commercial products" remain subject to *Zauderer* review. *NIFLA*, 138 S. Ct. at 2376. And, contrary to Plaintiffs' suggestion (at 17), *NIFLA*'s reference to *Hurley* merely reiterates that *Zauderer*'s standard for commercial disclosures of "purely factual and uncontroversial information" does not apply "outside that context." *See Hurley*, 515 U.S. at 573; *see also CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 848 (9th Cir. 2019) (rejecting a similar argument because "*NIFLA* plainly contemplates applying *Zauderer* to 'purely factual and uncontroversial disclosures about commercial products'" (quoting *NIFLA*, 138 S. Ct. at 2376)).

While Plaintiffs (at 21) accuse the District Court of never "even *mention*[*ing*]" *NIFLA*'s key rulings, it is Plaintiffs who fail to engage with *NIFLA*'s holding that *Zauderer* applies to disclosures about commercial products. *NIFLA* refutes Plaintiffs' suggestion (at 28) that commercial disclosures are permissible only on "speech otherwise voluntarily being undertaken by the business," since the disclosures about commercial products that *NIFLA* endorsed apply regardless of whether the business otherwise voluntarily engages in speech. And while Plaintiffs (at 22-23) suggest that *NIFLA* limited *Zauderer* to speech by professionals, *NIFLA* held the opposite,

explaining that *Zauderer* did not "turn[] on the fact that professionals were speaking." *NIFLA*, 138 S. Ct. at 2372.

*Third*, Plaintiffs claim (at 29) that *Zauderer* does not apply because the disclosures required by the Ordinance are "unrelated" to the transactions at issue. According to Plaintiffs (at 23), "the County's literature relates *not* to services offered by the dealer, but to services offered *by the County* to advance the *County's* policy interests."

This argument does not withstand scrutiny. The pamphlets relate to the safe use of guns and ammunition—the very products Plaintiffs sell. The suicide-prevention pamphlet identifies suicide warning signs to protect gun owners from the risk of suicide, and provides detailed information for storing guns safely. The conflict-resolution insert likewise identifies resources to help gun purchasers resolve their conflicts without resorting to violence. Both convey information that is directly connected to the subject of the commercial transactions the Ordinance regulates. And while the pamphlets refer readers to certain suicide-prevention and conflict-resolution services, those services likewise relate directly to the products Plaintiffs sell.

Plaintiffs' argument cannot be reconciled with *Recht*. That case involved a law requiring certain disclosures in legal advertisements that solicited clients for litigation involving medication. The law required advertisers to warn consumers not

to "stop taking a prescribed medication without first consulting with your doctor," and to disclose, where true, that the drug at issue "remains approved by" the FDA. 32 F.4th at 406 (quotation marks omitted). Thus, the law required disclosure about medical services provided by third parties rather than legal services provided by the attorneys regulated by the law. This Court nonetheless upheld the disclosure requirement, concluding that the case was "far from the boundary line staked out by *NIFLA*" because the disclosures provide "information directly connected to the subject of the advertisement, rather than by compelling speech concerning unrelated or competing services." *Id.* at 417. Even though attorneys were not in the business of providing medical advice, the disclosure related directly to the risks associated with the advertisements' reference to medications. For similar reasons, the Ordinance relates directly to the products Plaintiffs sell.

> ## B. The Ordinance Satisfies *Zauderer*.

*Zauderer* permits compelled commercial disclosure of "purely factual and uncontroversial information" if the disclosure advances a sufficiently weighty state interest, is reasonably tailored, and is not "unduly burdensome." *Recht*, 32 F.4th at 416, 418 (quoting *Zauderer*, 471 U.S. at 651). In applying this test, courts accord governments "leeway in balancing the important state interests against the individual rights involved." *Id.* at 405. This Court has likened *Zauderer* review to "rational basis scrutiny." *Greater Baltimore I*, 721 F.3d at 283.

The Ordinance readily satisfies *Zauderer*. The Ordinance serves the weightiest imaginable government interest; it provides for the disclosure of purely factual and uncontroversial information; and it is reasonably tailored and not burdensome.

1. *The Ordinance Advances A Weighty Government Interest*.

The Ordinance advances the County's paramount interest in protecting public health and safety. Gun violence is a leading cause of death in both the nation and in the County. Most deaths involving firearms—nationally and in the County—are suicides. And firearms are by far the leading means of suicide both nationally and in the County. The Ordinance seeks to combat this crisis of gun suicides and violence by equipping firearm purchasers with information to foster safe firearm use.

It is difficult to conceive of a more important government interest. Promoting "public health" and "safety" is a "substantial" government interest. *Fla. Bar v. Went For It, Inc*., 515 U.S. 618, 625 (1995) (quotation marks omitted). As this Court has explained, the "premier duty" of government "is to safeguard the health and safety of its citizens." *Recht*, 32 F.4th at 405.

Plaintiffs do not dispute the paramount importance of reducing gun suicides and other gun violence. But they nonetheless argue that this interest cannot satisfy *Zauderer*, which they claim (at 20, 29-30) permits disclosures only in "advertising" to prevent the "possibility of consumer confusion or deception."

28

Plaintiffs are wrong.  Correcting deceptive advertising was the interest at issue in *Zauderer*, but neither the Supreme Court nor this Court has ever suggested it is the exclusive interest that can satisfy *Zauderer*.  To the contrary, the Supreme Court in *NIFLA* endorsed "health and safety warnings" including warnings "about commercial products" that promote public health but do not involve deceptive advertising.  138 S. Ct. at 2376.  And this Court in *Recht* upheld a disclosure requirement supported both by "the State's interest in preventing consumer deception" and "its interest in furthering public health and safety."  32 F.4th at 418-419 (quotation marks omitted); *see id.* at 412 (law was supported by "two substantial interests"—"*protecting public health* and preventing deception" (emphasis added)).  Both this Court and the Supreme Court have thus rejected the proposition that the exclusive state interest sufficient under *Zauderer* is avoiding consumer deception.

In *Zauderer*, "it was natural for the Court to express the rule" in terms of consumer deception given that this was the interest at issue there, but *Zauderer*'s justification "sweeps far more broadly."  *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 22 (D.C. Cir. 2014) (en banc).  Other courts of appeals therefore "have unanimously concluded" that the *Zauderer* standard "applies even in circumstances where the disclosure does not protect against deceptive speech."  *CTIA*, 928 F.3d at 843.  The Ninth Circuit has held "that the governmental interest in furthering public health and safety is sufficient under *Zauderer* so long as it is substantial."  *Id.* at 844.

29

The D.C. Circuit has held that promoting informed consumer choice through country-of-origin disclosures was a sufficiently weighty interest under *Zauderer*. *See Am. Meat Inst.*, 760 F.3d at 24; *see also id.* at 31 (Kavanaugh, J. concurring in the judgment) ("traditional" government "health[] or safety interest" can support application of *Zauderer*). The Second Circuit has upheld a disclosure requirement to protect consumer health even though the disclosure "was not intended to prevent consumer confusion." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001) (quotation marks omitted). And the Sixth and First Circuits are in accord. *See Discount Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 556 (6th Cir. 2012); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 n.8 (1st Cir. 2005) (per curiam). Confining *Zauderer* to the prevention of consumer deception would give governments *less* authority to advance a *more compelling* interest, and would amount to "a flat and tendentious misreading of *Zauderer*." Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867, 882 (2015).

       2.  <u>*The Ordinance Requires Disclosure Of Purely Factual And Uncontroversial Information*</u>.

Plaintiffs do not claim that anything in the conflict-resolution insert is factually inaccurate, and have therefore forfeited any such argument. Nor do they articulate any objection to the overwhelming majority of the suicide-prevention pamphlet. Instead, Plaintiffs focus on one phrase on one page of the suicide-prevention pamphlet describing access to "lethal means," including "drugs and

30

firearms," as a "risk factor" for suicide. This statement is both factual and uncontroversial.

*First*, describing access to firearms and other lethal means as a suicide risk factor is factually accurate. The pamphlet defines risk factors as "characteristics or conditions that increase the chance that a person may try to take their life." JA795. This definition accords with the common meaning of a risk factor, which is "[a]nything that increases the possibility of harm or any other undesirable result." *Risk Factor*, Black's Law Dictionary (11th ed. 2019). Every major public health authority agrees that access to firearms increases the risk of suicide. NIH describes the "[p]resence of guns or other firearms in the home" as one of the "main risk factors for suicide." JA915. The CDC recommends "reducing access to lethal means for persons at risk of suicide," explains that safe storage of "firearms" and other dangerous household products can reduce suicide risk, and encourages "education and counseling around storing firearms locked in a secure place." JA875. The Maryland Department of Health similarly defines "[r]isk factors" for suicide to include "[e]asy access to lethal means among people at risk" such as "firearms, medications." JA923.

Underlying these pronouncements is a massive body of public-health literature, including 44 studies introduced in the record below, confirming "that access to and familiarity with firearms serves as a robust risk factor for suicide."

JA1166.  These studies "provide robust support for the notion that the presence of a gun is an important and unique risk factor for death by suicide and, as such, guns must be directly addressed in any successful suicide prevention effort."  JA1177. They find "strong evidence for increased odds of suicide among persons with access to firearms compared with those without access."  JA1185.  And they underscore that "safety efforts aimed at reducing accessibility and increasing safe storage of firearms would likely have a dramatic impact on statewide overall suicide rates." JA1166.

Plaintiffs do not address, let alone attempt to rebut, the public-health consensus describing access to guns as a suicide risk factor.  Instead, Plaintiffs proceed from the premise (at 7, 38) that the pamphlet "unambiguously" claims that access to guns "causes" suicide.  Plaintiffs assert this claim is disputed based on Professor Kleck's opinion that access to guns has not been conclusively proven to cause suicide.

But the pamphlet does not state that guns cause suicide.  The pamphlet instead describes access to guns as a suicide "risk factor," which invokes association rather than causation.  The pamphlet's statement that certain risk factors produce an increased chance of suicide does not mean that those risk factors are the cause of any particular suicide.  Context makes this clear.  Where the pamphlet speaks in causal terms, it states there is "no single cause" of suicide and does not mention guns.

JA793.  Compelled disclosures must be understood in context, and this Court has warned against interpreting a compelled disclosure in a manner that "cleaves" one part of the disclosure from the rest.  *Recht*, 32 F.4th at 417.  And Plaintiffs' expert *conceded* that if the pamphlet referred to association rather than causation, it is accurate.  JA93; JA245 (agreeing "that firearms ownership and firearms access is a risk factor for suicide if risk factor is used to mean a correlate").  Accordingly, while a causal assertion would itself satisfy *Zauderer*, this case does not raise, and this Court need not address, that separate question.

Plaintiffs assert (at 37) that the pamphlet uses "expressly causal language," because it states that people with access to firearms "*are* More at Risk For Suicide that Others," [*sic*], and that the verb "are" means "to exist."  This simply begs the question.  Of course, the pamphlet states that risk factors *in fact* make a person more at risk for suicide, but that does not mean the pamphlet asserts causation. Plaintiffs also cite (at 37-38) the pamphlet's statement that risk factors "increase the chance" of suicide, but again, that statement does not connote causation.  Indeed, a different page of the pamphlet states that "[c]onditions like depression … increase risk for suicide," while making clear that "[d]epression is the most common health condition *associated* with suicide."  JA793 (emphasis added).  And Plaintiffs fare no better in citing (at 37-38) dictionary definitions of "risk factor."  These definitions confirm

33

that risk factors *in fact* make a person "more susceptible" to a particular "negative condition," but do not claim that risk factors necessarily cause the condition.

The en banc Eighth Circuit rejected a materially identical argument about causation in *Planned Parenthood Minnesota, N. Dakota S. Dakota v. Rounds*, 686 F.3d 889 (8th Cir. 2012) (en banc). There, the court confronted a statute requiring physicians to inform patients seeking abortions about "risk factors" and an "[i]ncreased risk" of suicide among women who obtain an abortion. *Id.* at 892 (quotation marks omitted). The court rejected the argument that this requirement must be understood "to require a disclosure of a conclusive causal link between abortion and suicide," explaining that "*no language*" in the relevant provision "refers to such a causal link." *Id.* at 984 (emphasis added). The court highlighted the "very real difference" between "a statement that an action places an individual at an increased risk for an adverse outcome" versus "a statement that, if the individual experiences the adverse outcome, the action will have been the direct cause." *Id.* at 896. The court further agreed that when examining "complex" phenomena like "suicidal behavior, identification of a single, precise causal mechanism applicable to all situations is not possible," and "[g]iven this inherent complexity, sound epidemiological evidence is nevertheless derived by identifying those variables which are most strongly linked" with suicide for large groups. *Id.* at 895 (quotation marks omitted). The same reasoning applies here.

The Eighth Circuit deemed it relevant to consider "the accepted usage" of the disputed term "in the relevant medical field" in evaluating its meaning. Here, as in *Rounds*, usage of the term "risk factor" in the relevant field confirms that the term speaks to association. The Maryland Department of Health suicide-prevention resource, for example, makes clear that "[r]isk factors do not cause or predict suicide." JA923. And the public-health studies finding that firearms are a suicide risk factor likewise generally refer to association rather than causation. *See, e.g.*, JA1294 ("Our findings document a very strong association between handgun purchase and subsequent gun suicide."); JA1166 (an "extensive body of research has demonstrated an association between gun ownership and suicide"); JA1355 ("[t]he higher the percentage of households with loaded and unlocked guns in a state, the higher the overall suicide rate …, an association even stronger for firearm suicides").

Plaintiffs argue (at 41) that if the suicide-prevention pamphlet's risk-factor language does not refer to causation, it is "trivial" and cannot justify a disclosure requirement. This Court has rejected a similar argument, explaining that "the government need not prove a causal link" "to carry its burden of demonstrating that there is a reasonable fit" between means and ends for purposes of intermediate scrutiny. *United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014). The Eighth Circuit, too, rejected this argument in *Rounds*, noting that it is "typical medical practice to inform patients of statistically significant risks that have been associated"

35

with an outcome "even if causation has not been proved definitively." 686 F.3d at 905. And while Plaintiffs (at 41-42) cite *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 800 (2011), for the proposition that evidence of correlation cannot justify the Ordinance, the statute at issue in *Brown* was an outright ban on violent-video-game sales to minors, did not involve commercial speech, and was subject to "strict scrutiny" rather than *Zauderer* review. 564 U.S. at 789, 799. The Court in *Brown* contrasted these circumstances to an "*intermediate scrutiny*" case where the legislature was entitled to make "predictive judgment[s]" based on public-health research. *Id.* at 799.

*Second*, describing access to firearms as a suicide risk factor is uncontroversial. Of course, as District Court recognized, firearms are in some respects controversial, but preventing gun suicides is not. The pamphlet does not single out firearms, and instead identifies access to firearms among a list of more than a dozen other risk factors, including family history and access to drugs. The best evidence that the pamphlet is uncontroversial is that it was coauthored by NSSF—*the gun industry's trade group*. The pamphlet emphatically does not convey an anti-gun message, discourage the purchase of firearms, or take sides in the American debate about gun safety.

This case is therefore nothing like *NIFLA*. The law in *NIFLA* forced clinics to take sides in a political debate by effectively voicing support for abortion. "While

36

factual, the compelled statement took sides in a heated political controversy, forcing the clinic to convey a message fundamentally at odds with its mission." *CTIA*, 928 F.3d at 845. The Ordinance here does nothing of the kind. While Plaintiffs assert that describing access to firearms as a suicide risk factor implies that guns are a "bad thing" and tells customers "don't own a gun," accepting that argument would require this Court to reach the astonishing conclusion that the gun industry's own trade association coauthored a pamphlet implying that guns are bad and should not be purchased. Plaintiffs downplay (at 46-47) the pamphlet's author, but NSSF is not just "some" trade association; it is the "firearm industry trade association," and "relentlessly advocates for measures on behalf of" "the firearm and ammunition industry at all levels." JA803, JA806. NSSF's authorship of the pamphlet is powerful evidence that its risk-factor language is uncontroversial.

Plaintiffs (at 42-43) declare it "obvious" that Americans "are badly divided on the issue of firearms regulation and suicide." But Plaintiffs admit (at 32-33) that they do not "take issue with the County's goal of reducing the number of suicides and violent conflict resolutions." Plaintiffs' argument reduces to the assertion that the disclosure is controversial because they object to it. But, as this Court has explained, "any time there is litigation over a disclosure requirement, there is, by definition, a case or controversy concerning that requirement." *Recht*, 32 F.4th at 418 (quotation marks omitted). *Zauderer* asks not whether a regulated party objects

37

to a disclosure, but instead "whether the *content* of a required disclosure is controversial." *Id.* The need for factual disclosures may be most important where private businesses object to providing the information voluntarily.

Plaintiffs attempt to manufacture a factual dispute by insisting (at 45-47) that they subjectively understand the pamphlet to convey an anti-gun message and demanding that this Court accord them "any reasonable inference in their reading of the County's literature." But the pamphlet's meaning is a legal question, not a factual one, and parties cannot avoid summary judgment by claiming that their misunderstanding or mischaracterization of a compelled disclosure creates a factual dispute. In *Rounds*, for example, the en banc Eighth Circuit rejected the argument that language about suicide risk might be "construed to require a disclosure of a conclusive causal link between abortion and suicide" and instead treated the meaning of the disclosure as a question of law properly resolved at "summary judgment." 686 F.3d at 894, 906.

In *CTIA*, the Ninth Circuit similarly rejected at summary judgment the argument that an ordinance requiring disclosure about cell-phone-radiation risk was impermissible because it was "fraught with negative associations." 928 F.3d at 847. Rather than treating the issue as a question of fact, the Court explained that a local government cannot be faulted for using "precisely the phrase" the federal government uses to describe the same issue, and if "a retailer is concerned" that the

disclosure may be misunderstood, "the retailer may add to the compelled disclosure any further statement it sees fit to add." *Id.* at 847-848; *see also Meese v. Keene*, 481 U.S. 465, 478-480 (1987) (rejecting at summary judgment the argument that a disclosure requirement was invalid because members of the public may have a "potential misunderstanding" of a statutory term).

### 3. *The Ordinance Is Reasonably Tailored And Not Unduly Burdensome.*

Because the Ordinance advances a weighty interest and is both factual and uncontroversial, it satisfies *Zauderer* as long as it is neither "unjustified" nor "unduly burdensome." 471 U.S. at 651. This means that the disclosure must be reasonably tailored "to remedy a harm that is 'potentially real not purely hypothetical.'" *Recht*, 32 F.4th at 418 (quoting *NIFLA*, 138 S. Ct. at 2377). This "standard remains deferential" given commercial actors' minimal interest "in refraining from providing any particular factual information." *Id.* (quotation marks omitted).

The Ordinance is reasonably tailored to advance the County's health and safety interest. The harm the Ordinance addresses is far from "purely hypothetical," *id.*, —it is a public-health crisis. And the required disclosure is "reasonably related" to address that harm. *Id.* at 416. Pursuant to "well-established public health practice," the two pamphlets are tailored to gun owners because of the association between gun ownership and suicide and increased rates of gun homicide. JA778. The suicide-prevention pamphlet focuses on lethal means reduction and "includes actions that

gun owners can take to make themselves and their household safer." *Id.* And the conflict-resolution insert provides county-level resources to help gun owners resolve conflicts peacefully. It "is sound public health practice to develop materials tailored to gun owners and deliver it in a setting with a high number of gun owners to best reach a high-risk population." JA778-779.

This is not a case where the government subjected businesses to a disclosure requirement in lieu of "a public-information campaign." *NIFLA*, 138 S. Ct. at 2376. Instead, the Ordinance is just one feature of an extensive gun-violence-prevention campaign. *See* JA772-778 (describing County's gun-violence-prevention campaign). In addition to its other efforts to prevent gun suicides and violence, the County reasonably chose to require sellers of guns and ammunition to display and dispense this information at the point of sale, where the information may be particularly likely to reach the audience for whom it would make the most difference. That audience in turn may be more likely to credit the information as coming from a trusted messenger.

Nor is the Ordinance unduly burdensome. Many laws imposing disclosure requirements—including the law this Court upheld in *Recht*—require the regulated party to bear the cost of publishing the disclosure. *See Recht*, 32 F.4th at 406 (advertisers were required to bear cost of including mandated disclosure in advertisements); *CTIA*, 928 F.3d at 838 (ordinance required cell phone retailers to

provide disclosure "on a prominently displayed poster no less than 8½ by 11 inches with no smaller than 28-point font, or on a handout no less than 5 by 8 inches with no smaller than 18-point font"). Here, by contrast, the County provides the pamphlets to gun stores at no cost. Gun stores need only display the pamphlets and provide them to purchasers upon the sale of guns or ammunition, much like they provide a receipt. There is no risk that the disclosure "drowns out" the speaker's message, *NIFLA*, 138 S. Ct. at 2378, and no risk that the disclosure makes the prospect of other commercial speech by gun sellers "functionally impossible," *Recht*, 32 F.4th at 419.

Plaintiffs argue (at 31) that the Ordinance is "underinclusive" because it does not require pharmacies to warn about the risk of drug suicides or hardware stores to warn about the risk of suicides using ropes. Plaintiffs thus argue that the County must regulate every conceivable method of suicide if it seeks to regulate gun suicides. But the Supreme Court rejected that argument in *Zauderer* itself, stating: "we are unpersuaded" by the argument that a disclosure is impermissible "if it is 'under-inclusive'" and "does not get at all facets of the problem it is designed to ameliorate." 471 U.S. at 651 n.14. To the contrary, "governments are entitled to attack problems piecemeal." *Id*. Plaintiffs' argument is especially untenable here, as Plaintiffs entirely fail to address that guns are, by far, the most common means of suicide both nationally and in the County. The County can hardly be faulted for prioritizing its

41

limited public-health resources by addressing the most common and most lethal means of suicide first.

Plaintiffs dispute (at 40-41) whether the Ordinance will have any effect on gun suicide and violence. The authors of the suicide-prevention pamphlet, including NSSF, disagree, emphasizing that distributing the pamphlet "can help save lives." JA836. Limiting access to lethal means for persons at risk of suicide "reflects the scientific consensus on how to decrease the chances of death from a suicide attempt." JA777. The studies introduced in the District Court unanimously agree that "restricting access to lethal means is one of the most effective suicide prevention strategies," JA1347, and that "safety efforts aimed at reducing accessibility and increasing safe storage of firearms would likely have a dramatic impact" on suicide rates, JA1166. This Court has made clear it is not the Court's "task to assess the validity of the studies relied upon by the State or to make an empirical judgment as to whether mandatory disclosures are the most appropriate remedy." *Recht*, 32 F.4th at 419. "These are questions quintessentially reserved to the political branches, an assignment of responsibility that *Zauderer*'s deferential standard emphatically reinforces." *Id.*

42

**C. Plaintiffs' Arguments Would Call Into Question Scores Of Commercial Disclosure Requirements.**

For the bulk their brief, Plaintiffs insist (at 17, 20-22, 24, 29-30) that it could "hardly be clearer" that *Zauderer* is limited to disclosures about the terms under which "services will be available" and applies only to regulations of "advertising" designed to prevent "consumer confusion or deception." Late in their brief, however, Plaintiffs conduct an abrupt about-face, appearing to concede (at 30) that "safety warnings" for products "being advertised or sold" are permissible under *Zauderer*. This concession gives the case away. The Ordinance provides for exactly the kind of safety warning Plaintiffs concede to be lawful.

1. *Commercial Health And Safety Disclosures, Including About Firearms, Are Ubiquitous.*

In the context of commercial transactions, the "disclosure of truthful, relevant information is more likely to make a positive contribution to decisionmaking than is concealment of such information." *Ibanez*, 512 U.S. at 142 (quotation marks omitted). Mandatory disclosures of factual information "may even enhance" the constitutional value of commercial speech by providing consumers with more information. *Recht*, 32 F.4th at 416 (quoting Post, *Compelled Commercial Speech* at 877).

For that reason, commercial disclosure requirements are ubiquitous. It would be impossible to document comprehensively the disclosure requirements that govern

commercial life in the United States.  Federal law alone imposes innumerable disclosure requirements "to ensure consumer health or safety," and these interests "justify the compelled commercial disclosures that are common and familiar to American consumers, such as nutrition labels and health warnings." *Am. Meat Inst.*, 760 F.3d at 31 (Kavanaugh, J., concurring in the judgment).  Such requirements are especially common in warning consumers that a product could be dangerous if misused.  To take just a few examples, Congress (or federal agencies exercising authority delegated by Congress) require warnings regarding batteries, 15 U.S.C. § 2056e(a)(2); alcoholic beverages, 27 U.S.C. § 215; household substances hazardous to children, 15 U.S.C. § 1472; prescription drugs, 21 C.F.R. § 201.100(d); children's toys, 16 C.F.R. § 1500.19(b); pesticides, 40 C.F.R. pt. 156; sunlamps, 21 C.F.R. § 1040.20(d)(1); and many others.  These requirements would suddenly be in doubt under Plaintiffs' theory (at 17, 23) that strict scrutiny applies unless a disclosure relates to the terms under which "*services*" will be available or that *Zauderer* is limited to preventing deceptive "advertising."

The federal government is not alone in requiring disclosures about potentially dangerous products.  Examples abound.  States in this Circuit, for example, require warnings regarding dry cleaning bags, Va. Code Ann. § 18.2-320; pesticides, N.C. Gen. Stat. § 143-443(a)(3); and various hazardous substances, S.C. Code Ann. § 23-39-20.  Virginia requires restaurants that serve raw or undercooked foods to "inform

consumers of the significantly increased risk of consuming such foods" via "a disclosure … using brochures … or other effective written means."  12 Va. Admin. Code § 421-930.  Virginia also requires adult entertainment venues, truck stops, and certain medical facilities to post signs warning about the danger of human trafficking. Va. Code Ann. §§ 40.1-11.3; 32.1-133.1.  West Virginia requires a similar human-trafficking disclosure for businesses where alcohol is consumed, among other locations.  W.V. Code § 15A-2-5.  Under Plaintiffs' theory, however, these laws would risk invalidation as fatally underinclusive, because no state imposes disclosure requirements with respect to every potentially hazardous product or food, or every potential venue where human trafficking might occur.

Numerous commercial disclosure requirements apply specifically to firearms. The federal government has for nearly two decades required federally licensed dealers to display and distribute to handgun buyers a "written notification" stating that "[t]he misuse of handguns is a leading contributor to juvenile violence and fatalities," explaining that secure firearm storage "will help prevent the unlawful possession of handguns by juveniles, stop accidents, and save lives."  27 C.F.R. § 478.103.  Many states and localities impose similar disclosure requirements regarding firearms.  More than a dozen states ranging from North Carolina to Florida to Texas, for example, require firearms dealers to warn gun purchasers about storing guns where children can access them.  *See, e.g.*, N.C. Gen. Stat. § 14-315.2; Fla. Stat.

§ 790.175; Tex. Penal Code Ann. § 46.13(g).  Again, Plaintiffs' theory would call each of these laws into question.

> 2.  *Plaintiffs Cannot Distinguish The Ordinance From Other Longstanding Compelled Commercial Disclosures.*

Plaintiffs utterly fail to distinguish the Ordinance from disclosure requirements they concede to be permissible.  Plaintiffs argue (at 30), with no citation, that product warnings "typically" relate to "the very specific product or type of product being advertised or sold by the seller."  But Plaintiffs never explain why a disclosure about firearm suicide and conflict prevention is less "specific" than the "typical[]" disclosure.  Nor do Plaintiffs distinguish the Ordinance from disclosure requirements pertaining to broad categories like alcoholic beverages, prescription drugs, and pesticides—let alone from other disclosure requirements pertaining to firearms themselves.

Plaintiffs in a footnote (at 30 n.2) distinguish the Ordinance from compelled disclosures regarding drug labelling and children's toys, but this effort is glaringly insufficient.  Plaintiffs' insistence (at 30 n.2) that the extensive federal drug-labeling obligations are somehow more "narrow" than the disclosure required by the Ordinance is self-evidently incorrect.  And while Plaintiffs observe (at 30 n.2) that federal law requiring warnings on toys "sets forth the precise warning that must be given," the Ordinance similarly requires the County to provide the precise literature that gun stores display and distribute.  Apart from these two examples, Plaintiffs do

46

not even attempt to distinguish the scores of other disclosure laws their theory would call into doubt.

Plaintiffs argue (at 30-31) that the County's literature does not warn consumers about "hidden dangers" and that "[e]very purchaser of firearms from a licensed dealer already knows that a firearm can be dangerous if misused." For one thing, however, the suggestion that warnings are only permissible for "hidden" dangers is utterly unsupported, and would call into question warning labels for products like cigarettes and alcohol whose risks are well known (in part thanks to the warnings themselves). For another, Plaintiffs' argument ignores the evidence that owners of firearms substantially underestimate the risk of suicide associated with an unlocked gun in the house, and the Ordinance therefore *does* warn consumers about hidden dangers that make a warning especially appropriate. *See* Amanda I. Mauri *et al.*, *Firearm Storage Practices and Risk Perceptions*, 57 57 Am. J. Preventive Med. 830, 835 (2019) (noting that "increase in unsafe storage has occurred in tandem with a growing public perception that guns make homes safer rather than more dangerous"). Plaintiffs have not made a serious effort to disclaim the radical results their theory would portend.

## II.    THE DISTRICT COURT PROPERLY EXCLUDED THE REPORT OF PLAINTIFFS' EXPERT.

The District Court properly excluded Professor Kleck's report on relevance grounds, and its decision was certainly not an abuse of discretion. District courts

possess "considerable discretion to determine whether to admit expert testimony." *United States v. Iskander*, 407 F.3d 232, 238 (4th Cir. 2005). The "Supreme Court has cautioned appellate courts against 'fail[ing] to give the trial court the deference that is the hallmark of abuse-of-discretion review' in the expert testimony context." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 962 (4th Cir. 2020) (citation omitted).

Relevance "is a precondition for the admissibility of expert testimony." *Ancient Coin Collectors Guild*, 899 F.3d at 318. The District Court here correctly ruled that Professor Kleck's expert report was not relevant. Professor Kleck's report, like his testimony, began from the premise that the suicide-prevention pamphlet's description of access to firearms as "a 'risk factor' infers that it is a causal factor" for suicide. JA1683. But, as the District Court explained, the pamphlet does not assert a causal link between firearms access and suicide. "The pamphlet identifies access to firearms and other lethal means as a 'risk factor,' and nothing more," and the pamphlet "specifically avoids making any causal accusation." JA1683-1684. Because Professor Kleck conceded that the pamphlet was accurate if "risk factor" refers to association rather than causation, *see* JA93, the District Court reasonably concluded that Professor Kleck's straw-man opinions regarding causation were not relevant to evaluating the language the pamphlet actually uses.

Plaintiffs maintain (at 48-49) that the District Court erred by drawing inferences in favor of the County's interpretation of the suicide-prevention pamphlet at summary judgment. The Supreme Court, however, has rebuffed this same argument. "On a motion for summary judgment, disputed issues of fact are resolved against the moving party … [b]ut the question of admissibility of expert testimony is not such an issue of fact, and is reviewable under the abuse-of-discretion standard." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). The Court in *Joiner* added that it is "not an abuse of discretion" for a district court to reject an expert's opinions where they are not "sufficiently supported" by the underlying evidence. *Id.* at 144-145. That is precisely the conclusion the District Court drew here regarding Professor Kleck's interpretation of "risk factor." JA1685.

In any event, any error in excluding Professor Kleck's opinion was harmless given that Professor Kleck's opinions about causation would not have given rise to a genuine issue of disputed fact even had they been admitted. *See Dorman v. Annapolis OB-GYN Assocs., P.A.*, 781 F. App'x 136, 146 (4th Cir. 2019) ("Given the contested evidence's lack of relevance …, any error in the court's holdings was harmless."). And Professor Kleck's opinions were independently excludable on multiple additional grounds. *See United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995) (affirming district court's exclusion of expert evidence "on different grounds than those employed by the trial court"). Among other problems, Professor Kleck

cherry-picked the authorities on which he relied; he concededly failed to consider a study concluding that "unmeasured confounding alone is unlikely to explain the association between firearms and suicide," which flatly contradicts his opinion, JA1498; and large portions of his report are a verbatim copy of a book chapter he authored in 2019 and therefore fail to address more recent research contradicting his position. *See* Mem. in Supp. of Mot. in Limine, D. Ct. Dkt. 44-1. The decision to exclude Professor Kleck's flawed opinions was far from an abuse of discretion.

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be affirmed.


                                        Respectfully submitted,

Gregory J. Swain                        /s/ Neal Kumar Katyal
   County Attorney                      Neal Kumar Katyal
Hamilton F. Tyler                       William E. Havemann
   Deputy County Attorney               Simon Chin
Tamal A. Banton                         Hogan Lovells US LLP
   Senior Assistant County Attorney     555 Thirteenth Street, N.W.
Anne Arundel County Office of Law       Washington, D.C. 20004
2660 Riva Road, 4th Floor               (202) 637-5600
Annapolis, Maryland 21401               neal.katyal@hoganlovells.com
(410) 222-7888 telephone                will.havemann@hoganlovells.com
(410) 222-7835 facsimile
htyler@aacounty.org                     Eric Tirschwell
tbanton@aacounty.org                    James Miller
                                        Nina Sudarsan
                                        Everytown Law
                                        450 Lexington Avenue
                                        P.O. Box 4184
                                        New York, NY 10017
                                        (646) 324-8222
                                        etirschwell@everytown.org
                                        jedmiller@everytown.org
                                        nsudarsan@everytown.org

                        *Counsel for Appellee*

July 10, 2023

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,155 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Times New Roman14-point font using Microsoft Word for Office 365.

July 10, 2023                              /s/ Neal Kumar Katyal
                                           Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on July 10, 2023.  All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


July 10, 2023                                     /s/ Neal Kumar Katyal
                                                  Neal Kumar Katyal