No. 23-1351

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARYLAND SHALL ISSUE, INC., *et al.*,

*Plaintiffs-Appellants*,

v.

ANNE ARUNDEL COUNTY, MARYLAND,

*Defendant-Appellee*.

*On Appeal from the United States District Court*
*for the District of Maryland*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER
## AS *AMICUS CURIAE*
## IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE

Elizabeth B. Wydra
Brianne J. Gorod
J. Alexander Rowell
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF *AMICUS CURIAE* ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ................................................................................... 3

    I.   Commercial Entities Can Be Required to Inform Persons About Their Products and Related Risks Consistent with the First Amendment ............................................................................ 3

        A. *Zauderer*'s Deferential Standard of Review Extends to "Purely Factual and Uncontroversial" Disclosures Regarding Products for Sale. .......................................................................... 4

        B. The Challenged Disclosures Are Governed by *Zauderer* and Survive Rational Basis Review. .................................................. 10

    II.  Appellants' Interpretation of the First Amendment Would Threaten a Vast Array of Disclosure Laws ............................................... 17

CONCLUSION ................................................................................ 27

CERTIFICATE OF COMPLIANCE ....................................................... 1A

CERTIFICATE OF SERVICE .............................................................. 2A

i

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Am. Hosp. Ass'n v. Azar*,
468 F. Supp. 3d 372 (D.D.C. 2020) .................................................. 8, 9

*Am. Meat Inst. v. USDA*,
760 F.3d 18 (D.C. Cir. 2014) ................................................ 6, 7, 9, 18

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989) ................................................................... 2

*Central Hudson Gas & Elec. Corp. v. Pub. Servs. Comm'n of N.Y.*,
447 U.S. 557 (1980) ................................................................... 2

*CTIA – The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ............................................. 7, 8, 9, 12

*Expressions Hair Design v. Schneiderman*,
877 F.3d 99 (2d Cir. 2017) .......................................................... 9

*Greater Baltimore Center for Pregnancy Concerns, Inc. v. Baltimore*,
879 F.3d 101 (4th Cir. 2018) ...................................................... 14

*Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp.*,
515 U.S. 557 (1995) ................................................................... 8

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) ............................................................... 4, 18

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
272 F.3d 104 (2d Cir. 2001) ...................................................... 7, 9

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
138 S. Ct. 2361 (2018) ........................................................ *passim*

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. ___ (2023) ............................................................ 6

*N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*,
  556 F.3d 114 (2d Cir. 2009) .............................................. 7

*Pharm. Care Mgmt. Ass'n v. Rowe*,
  429 F.3d 294 (1st Cir. 2005) ............................................ 7

*Planned Parenthood Minnesota v. Rounds*,
  686 F.3d 889 (8th Cir. 2012) ............................................ 11

*Recht v. Morrisey*,
  32 F.4th 398 (4th Cir. 2022) ............................. 2, 3, 5, 15, 16

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Coun-*
  *cil, Inc.*,
  425 U.S. 748 (1976) ...................................................... 2, 3, 17

*West Virginia State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ........................................................ 1

*Zauderer v. Office of Disciplinary Couns. of Sup. Ct. of Ohio*,
  471 U.S. 626 (1985) ................................................... *passim*

LEGISLATIVE MATERIALS

27 C.F.R. § 478.103 ............................................................ 24

29 C.F.R. § 516.4 .............................................................. 20

44 Fed. Reg. 37,434 (June 26, 1979) ...................................... 18

Fla. Stat. § 456.44(7) ........................................................ 21

# TABLE OF AUTHORITIES – cont'd

Page(s)

235 Ill. Comp. Stat. 5/6-24a ................................................ 21

Mass. Stat. 140 § 123 ......................................................... 25

Md. Code, Al. Bev. § 36-203.1(2)(ii) .................................. 20

Md. Code, Bus. Reg. § 19-103 ............................................ 23

Md. Code, Lab. & Empl. § 3-423 ........................................ 20

Md. Code, Lab. & Empl. § 3-1306 ...................................... 19

Md. Code Regs. § 36.03.06.03 ............................................ 21

Me. Rev. Stat. tit. 25 § 2012 ............................................... 25

Montgomery Cnty. Md. Code § 33B-3 ................................ 22

Montgomery Cnty. Md. Code § 33B-8 ................................ 22

Myrtle Beach, S.C. Code. of Ord. § 12-165 ........................ 22

N.C. Gen. Stat. § 14.202.13 ................................................ 23

N.C. Gen. Stat. § 14-315.2 .................................................. 24

N.C. Gen. Stat. § 18B-1003 ................................................ 23

N.C. Gen. Stat. § 19-8.4 ...................................................... 23

N.C. Gen. Stat. § 131E-84.1 ............................................... 23

N.C. Gen. Stat. § 143B-348 ................................................ 23

N.C. Gen. Stat. § 143B-431.3 ............................................. 23

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Pub. L. 89-92, 79 Stat. 282 (July 27, 1965) ................................... 18

Pub. L. 100-690, 102 Stat. 4181 (Nov. 18, 1988) .......................... 19

Pub. L. 101-535, 104 Stat. 2353 (Nov. 8, 1990) ............................ 19

Pub. L. 111-148, 124 Stat. 119 (Mar. 23, 2010) ............................ 19

Wash. Rev. Code § 9.41.090 ........................................................ 25

Wash. Rev. Code § 9.41.310 ........................................................ 25

S.C. Code § 16-3-2100 ................................................................. 23

29 U.S.C. § 657(c) ....................................................................... 19

38 U.S.C. § 4334(a) ..................................................................... 19

42 U.S.C. § 2000e-10(a) .............................................................. 19

Utah Code § 32B-5-301 ............................................................... 21

Va. Code § 32.1-133.1 ................................................................. 23

Va. Code § 40.1-11.3 ................................................................... 23

Va. Code § 40.1-28.7:3 ................................................................ 19

Va. Code § 3.2-6403(D) ............................................................... 22

Wash. Session Law 1143-S2 (Apr. 14, 2023) ............................... 25

Wis. Admin. Code ATCP § 29.41(3) ............................................ 22

W. Va. Code § 15A-2-5 ................................................................ 23

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

W. Va. Code § 21-5F-3(h) ........................................................ 19

W. Va. Code § 60-6-25 ............................................................ 21

OTHER MATERIALS

Casey Adams, *A Compelling Case: Exploring the Law of Disclosures after NIFLA*, 82 U. Pitt. L. Rev. 353 (2020)..................................... 14

Andrew Anglemeyer, Tara Horvath, & George Rutherford, *The Accessibility of Firearms and Risk for Suicide and Homicide Victimization Among Household Members*, Ann. of Intern. Med. 101 (Jan. 21, 2014) ............................................................................. 10

Anne Arundel County Report of the Gun Violence Prevention Task Force (June 5, 2020)............................................................... 16

Melissa Block, *Gun Shops Work With Doctors To Prevent Suicide By Firearm*, NPR (Nov. 21, 2018) ............................................... 13

Stephen Breyer, *Regulation and Its Reform* (1982).............................. 17

Gifford Law Center, *Gun Dealers* ........................................... 24

Harvard T.H. Chan School of Public Health, *Gun Shop Project* ........... 13

National Shooting Sports Foundation, *NSSF/AFSP Partnership* ........... 12

Andra Lim, Note, *Limiting NIFLA*, 72 Stan. L. Rev. 127 (2020) .......... 17

Washington Dep't of Fish & Wildlife, *Firearms Safety, Suicide Awareness, The Law, and You* ............................................. 25

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution. Because this case raises questions about the scope of the First Amendment and the limits it imposes on governmental efforts to enact health and safety regulations, CAC has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The First Amendment provides indispensable protections against compelled speech: "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). But courts have long recognized that these protections do not eliminate the government's ability to require commercial actors to disclose information connected to the goods and services they provide. Indeed, "[f]or almost two centuries, commercial speech . . . was understood to fall outside the First

---

[1] *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. Appellee consents to the filing of this brief. Appellants do not consent. A motion requesting leave to file has been docketed herewith.

Amendment's ambit." *Recht v. Morrisey*, 32 F.4th 398, 407 (4th Cir. 2022).  While the Supreme Court eventually extended First Amendment protections to commercial speech in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), it has consistently recognized that this type of speech is different, and the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression," *Central Hudson Gas & Elec. Corp. v. Pub. Servs. Comm'n of N.Y.*, 447 U.S. 557, 562-63 (1980).  As such, "commercial speech can be subjected to 'modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Recht*, 32 F.4th at 408 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989)).

Appellee Anne Arundel County has enacted such a regulation.  Sellers of guns and ammunition in the County are now required to provide literature to their customers about suicide prevention and nonviolent conflict resolution.  The suicide prevention pamphlet—developed jointly by the firearm industry's trade association and a suicide prevention health organization—explains that "[a]ccess to lethal means including firearms and drugs" is one of many "risk factors" for suicide.  JA28.  And after warning customers about this connection, the pamphlet explains how to identify potential signs of suicidal ideation, provides resources on how to prevent suicides, and suggests options for "safely storing and protecting your firearms."  JA31.

This regulation is plainly the type of warning and disclosure that has long been

constitutional.  Indeed, the Supreme Court expressly reaffirmed the constitutionality of this type of disclosure just five years ago.  *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (expressly noting that it "[did] not question the legality of health and safety warnings long considered permissible, or purely factual and uncontroversial disclosures about commercial products").  To hold otherwise would place at risk countless disclosure requirements from pharmaceutical warning labels to responsible gambling signage, and it would unjustifiably prevent state and local governments from fulfilling their "premier duty . . . to safeguard the health and safety of [their] citizens."  *Recht*, 32 F.4th at 405. This Court should affirm.

## ARGUMENT

### I. Commercial Entities Can Be Required to Inform Persons About Their Products and Related Risks Consistent with the First Amendment.

When the Supreme Court held in 1976 that commercial speech was protected by the First Amendment, the majority took care to explain that this did not mean "that it can never be regulated in any way."  *Virginia State Bd. of Pharmacy*, 425 U.S. at 770.  And for decades legislatures have required commercial actors to disclose information to consumers using a variety of means, including warning labels, product disclosures, and on-premises signage, without triggering constitutional concerns.  The Supreme Court has long recognized that when those disclosures are "health and safety warnings" or "purely factual and uncontroversial

3

disclosures about commercial products," *NIFLA*, 138 S. Ct. at 2376, the deferential

standard of review articulated in *Zauderer v. Office of Disciplinary Counsel of*

*Supreme Court of Ohio*, 471 U.S. 626 (1985), applies.  Because the disclosures at

issue here fall squarely within both of those categories, the district court was correct

to apply the *Zauderer* standard.

> **A. *Zauderer*'s Deferential Standard of Review Extends to "Purely Factual and Uncontroversial" Disclosures Regarding Products for Sale.**

In *Zauderer v. Office of Disciplinary Counsel*, the Supreme Court affirmed

that it is constitutional to require attorneys to include "purely factual and

uncontroversial information" about their fees in advertisements because the state

rule was "reasonably related" to the government's proffered interest in preventing

consumer deception.  471 U.S. 626, 651-62 (1985).  The use of a deferential standard

is justified in circumstances like these because "when a State . . . requires the

disclosure of beneficial consumer information, the purpose of its regulation is

consistent with the reasons for according constitutional protection to commercial

speech."  *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (plurality

op.).

In *NIFLA*, the Supreme Court held that California's mandatory disclosures for

facilities providing pregnancy-related services likely violated the First Amendment.

138 S. Ct. at 2378.  In relevant part, the Court concluded that requiring licensed

facilities to distribute a notice about the availability of state-provided health services,

including abortion, was not governed by *Zauderer* because the notice "in no way relate[d] to the services that licensed clinics provide" but instead required facilities to share information about state-sponsored abortion—"anything but an 'uncontroversial' topic." *Id.* at 2372. But even as the Supreme Court struck down the disclosure requirements at issue in that case, the Court was explicit that it was not questioning "the legality of . . . purely factual and uncontroversial disclosures about commercial products." *Id.* at 2376. Accordingly, as this Court recently recognized, *"Zauderer* generally applies to the mandatory disclosure of commercial speech." *Recht*, 32 F.4th at 416. The disclosures at issue here—requiring firearms dealers to provide factual and uncontroversial disclosures related to the potential risks of firearms—fall squarely within the category of disclosures governed by *Zauderer*.

In *Zauderer*, the Court considered an attorney's First Amendment challenge to a state rule which, pursuant to the "State's interest in preventing deception of consumers," mandated certain disclosures in attorney advertisements for contingent-fee services. 471 U.S. at 650-51. Noting that the law did not "prevent attorneys from conveying information to the public," but instead "only required them to provide somewhat more information than they might otherwise be inclined to present," the Court rejected the claim. *Id.* at 650. It distinguished the case from non-commercial compelled speech cases because "[t]he State has attempted only to

prescribe what shall be orthodox in commercial advertising" by requiring "that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available." *Id.* at 651. And while recognizing that "unjustified or unduly burdensome" disclosures may be unconstitutional, it held that the challenged disclosure requirements were "reasonably related to the State's interest in preventing deception of consumers" and therefore permissible. *Id.* at 651-52.

Appellants attempt to escape *Zauderer*'s deferential standard of review by claiming that it only applies when mandated disclosures "regulate advertising" and address "consumer confusion or deception." MSI Br. 30.[2] But courts have roundly rejected such a narrow reading of *Zauderer*. As the Supreme Court has recognized, its "opinions dispose of discrete cases and controversies and must be read with a careful eye to context." *Nat'l Pork Producers Council v. Ross*, 598 U.S. ___ (2023) (slip op., at 11). In *Zauderer*, preventing consumer deception was the particular

---

[2] Appellants also imply that the court below erred by omitting the reference to professionals when quoting *NIFLA*'s statement that "our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" MSI Br. 21-22 (asserting that "[t]he plaintiff dealers here are indisputably not 'professionals' and that matters"); *NIFLA*, 138 S. Ct. at 2372. But Appellants themselves omit crucial context: in the preceding sentence, the Court explained that such cases did not "turn[] on the fact that professionals were speaking." *NIFLA*, 138 S. Ct. at 2372.

interest the state furthered by requiring advertising to state the distinction between "legal fees" and "costs." 471 U.S. at 651-52. As such, "it was natural for the Court to express the rule in such terms." *Am. Meat Inst. v. USDA*, 760 F.3d 18, 22 (D.C. Cir. 2014) (en banc).

All the courts of appeals that have addressed the issue have correctly held that *Zauderer* extends further. "The language with which *Zauderer* justified its approach . . . sweeps far more broadly than the interest in remedying deception." *Am. Meat Inst. v. USDA*, 760 F.3d 18, 22 (D.C. Cir. 2014) (en banc). The *Zauderer* Court's conclusion that a commercial "speaker's interest in opposing forced disclosure" of factual and uncontroversial information is "minimal" is "inherently applicable beyond the problem of deception." *Id.* (citing *N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 133 (2d Cir. 2009); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 (1st Cir. 2005) (Torruella, J.); *id.* at 316 (Boudin, C.J. & Dyk, J.); *id.* at 297-98 (per curiam); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-15 (2d Cir. 2001)); *see also CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 844 (9th Cir. 2019). As such, *Zauderer* review applies when governments impose commercial disclosure requirements to further a variety of "substantial interests." *Am. Meat Inst.*, 760 F.3d at 23; *see id.* at 331 (Kavanaugh, J., concurring in judgment) (explaining that "traditional anti-deception, health, or safety" interests and the "interest in supporting American [producers]" from foreign competition are

7

sufficiently substantial).

Appellants argue that "*NIFLA* sharply limited the reach of *Zauderer* to its facts," MSI Br. 17, but the Court's reassurance that it was not calling into question "health and safety warnings . . . or purely factual and uncontroversial disclosures about commercial products," *NIFLA*, 138 S. Ct. at 2376, is incompatible with Appellant's view that strict scrutiny applies to disclosures that do not combat deceptive advertising.  Indeed, the *NIFLA* majority actually "signaled its agreement" with a reading of *Zauderer* that extends deferential review to requirements addressing more than just deception.  *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 844 (9th Cir. 2019).  And, contrary to Appellants' suggestion, *NIFLA*'s reference to *Hurley v. Irish-American Gay, Lesbian, and Bisexual Group*, 515 U.S. 557 (1995), *see* MSI Br. 17, does not refute this.  *Hurley* simply reiterates that *Zauderer*'s lower standard for commercial disclosures of "purely factual and uncontroversial information" does not apply "outside that context," *id.* at 573, to compelled speech requirements "in the context of an expressive parade," *id.* at 577.

If Appellants' view were correct, the *NIFLA* Court could have simply noted that the requirement that licensed facilities "disseminate a government-drafted notice on site," 138 S. Ct. at 2369, to ensure that residents knew their rights did not address deceptive advertising and move on.  It did not.  *Id.* at 2372; *see Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 392 (D.D.C. 2020) (noting *NIFLA* "said nothing

8

indicating that the *Zauderer* framework is limited to compelled advertising or point-of-sale disclosures—even as it analyzed a compelled disclosure that was not an advertisement"), *aff'd*, 983 F.3d 528 (D.C. Cir. 2020). Instead, it viewed the *Zauderer* requirements more broadly, ultimately concluding that the lower standard did not apply because the challenged disclosures were not, in the Court's view, "limited to purely factual and uncontroversial information about the terms under which . . . services will be available." *Id.* (internal quotations omitted).

*Zauderer*'s broad scope is exemplified in the wide variety of disclosures that have been upheld under its deferential standard of review. Vermont's mandatory product and packaging disclosures instructing users to properly dispose of mercury-containing light bulbs were upheld as reasonably related to the government's "interest in protecting human health and the environment." *Nat'l Elec. Mfrs. Ass'n*, 272 F.3d at 113-16. It was constitutionally permissible under "*NIFLA*'s clarification of the *Zauderer* framework" for the city of Berkeley to require cell phone retailers to provide prospective buyers disclosures about cell phone radiation to protect "the health and safety of consumers." *CTIA*, 928 F.3d at 837, 843-49 (reversing preliminary injunction). Federal country-of-origin labeling requirements on meat have likewise been upheld as permitted disclosures under *Zauderer*. *Am. Meat Inst.*, 760 F.3d at 22-27.

In short, *Zauderer*'s "more lenient standard of review" applies whenever the

government "forces a commercial entity to make 'purely factual and uncontroversial' disclosures regarding the product it is offering for sale." *Expressions Hair Design v. Schneiderman*, <u>877 F.3d 99, 103</u> (2<u>d Cir. 2017</u>).

**B. The Challenged Disclosures Are Governed by *Zauderer* and Survive Rational Basis Review.**

Because the County's required disclosures are "purely factual and uncontroversial disclosures about commercial products," *NIFLA*, <u>138 S. Ct. at 2376</u>, rational basis review applies. And because the disclosures are "reasonably related" to the County's interest in protecting public health and safety, *Zauderer*, <u>471 U.S. at 628</u>, they easily survive this review.

*Factual and uncontroversial*

To start, the disclosures are factual because, as the district court correctly held, "the statement that access to firearms is a risk factor for suicide is factual." <u>JA1686</u> (collecting expert reports and "numerous studies demonstrating this well-documented correlation"). Indeed, scientific evidence shows that those with access to firearms are indeed "[m]ore at [r]isk for [s]uicide than" those without access. <u>JA28</u>; *see, e.g.,* Andrew Anglemeyer, Tara Horvath, & George Rutherford, *The Accessibility of Firearms and Risk for Suicide and Homicide Victimization Among Household Members*, Ann. of Intern. Med. 101, 105 (<u>Jan. 21, 2014</u>) (analyzing 16 studies and finding "strong evidence for increased odds of suicide among persons

10

with access to firearms compared with those without access") (JA1185).

Appellants' argument to the contrary primarily focuses on a single page of the County's required pamphlets titled "Some People are More at Risk for Suicide than Others." *See* MSI Br. 4-5; 36-47. This page identifies "[a]ccess to lethal means including firearms and drugs" as one of several "risk factors" of suicide (defined as "characteristics or conditions that increase the chance that a person may try to take their life"). JA28. According to Appellants, the literature is not factual because it conveys that "mere access to firearms is a causal factor in suicides." MSI Br. 36; *see id.* at 37-38 (arguing that the use of the term "risk factors" means that the literature includes "statements of causation"). But this is not the case. As the *en banc* Eighth Circuit has held, a statute that requires disclosures of "risk factors" and "increased risk of suicide ideation and suicide" "does not imply a disclosure of a causal relationship." *Planned Parenthood Minnesota v. Rounds*, 686 F.3d 889, 897-98 (8th Cir. 2012) (*en banc*); *see id.* at 895 (noting that "a requirement for conclusive proof of causation" is "[n]oticeably absent from the contextual definition of 'increased risk'"). Instead, as here, the disclosure simply states that the risk of suicide is higher in one group than in another relevant group. *Id.* at 898.

The disclosures are also uncontroversial because they do not force plaintiffs to convey a message fundamentally at odds with their mission on a topic as politically contested as state-sponsored abortion services. In *NIFLA*, the Supreme

11

Court concluded that *Zauderer* did not apply to a requirement that crisis pregnancy clinics provide information about state-sponsored abortion services in part because this was "anything but an 'uncontroversial' topic." 138 S. Ct. at 2372. There, as Justice Kennedy explained in a concurrence joined by three other justices, the disclosure mandate, by requiring "primarily pro-life pregnancy centers to promote the State's own preferred message advertising abortions," forced "individuals to contradict their most deeply held beliefs, beliefs grounded in basic philosophical, ethical, or religious precepts." *Id.* at 2379 (Kennedy, J., concurring). This uniquely charged situation does not suggest that "any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial." *CTIA*, 928 F.3d at 845. Instead, *NIFLA* stands only for the proposition that when a disclosure takes "sides in a heated political controversy" and forces an entity "to convey a message fundamentally at odds with its mission," it is "controversial" under *Zauderer.  Id.; see id.* at 848.

Appellants argue that the disclosures are controversial by baldly asserting that Americans "are badly divided on the issue of firearms regulation and suicide." MSI Br. 42-43. But the facts belie this claim. The National Shooting Sports Foundation—an author of the contested suicide prevention pamphlet in this case— "is systematically disseminating suicide prevention education materials to thousands of firearms retailers, shooting ranges, and gun owners nationwide" through its

12

partnership with a leading anti-suicide organization. National Shooting Sports Foundation, *NSSF/AFSP Partnership*, https://www.nssf.org/safety/suicide-prevention/nssf-afsp-partnership/ (last accessed July 12, 2023). And coalitions of firearms dealers and public health advocates have formed across the country to encourage dealers to take action to help prevent suicide and provide educational materials for customers. Harvard T.H. Chan School of Public Health, *Gun Shop Project*, https://www.hsph.harvard.edu/means-matter/gun-shop-project/ (last accessed July 12, 2023); *see also* Melissa Block, Gun Shops Work With Doctors To Prevent Suicide By Firearm, NPR (Nov. 21, 2018) (noting that a "diverse group that includes doctors, public health researchers and gun shop owners . . . . has found common ground on at least one issue: preventing firearm suicide").

Even setting those examples aside, Appellants' focus on supposed political division elides that the key question under *NIFLA* is whether the content of the challenged disclosure is itself controversial, not whether the requirement is broadly connected to a contested issue. To read *NIFLA* to exclude from *Zauderer* all disclosures associated with political disagreements would leave little within its realm. Sellers of high-calorie foods could avoid nutritional fact disclosures by arguing that Americans "are badly divided on the issue," MSI Br. 42, of optimal nutrition. Manufacturers of opioid pain medications could strip their products of warning labels by noting that the opioid crisis is a hot political topic. It is difficult

to imagine which "health and safety warnings long considered permissible," 138 S. Ct. at 2376, could survive such a capacious test of what is "controversial."

Properly interpreted, *NIFLA* does not suggest that the County's regulation is too controversial for *Zauderer* review.  Sharing a booklet created by a leading firearms trade group in no way forces Appellants to take sides on an issue like whether states should provide abortion care.  While the "abortion debate in our country has a long and bitter history" with "[v]ast disagreement on the merits," *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Baltimore,* 879 F.3d 101, 113 (4th Cir. 2018), there is great consensus on the merits of preventing suicide. Appellants themselves admit that they do not "take issue with the County's goal of reducing the number of suicides and violent conflict resolutions."  MSI Br. 32-33. Their policy disagreement on how to achieve that goal does not render a pamphlet providing facts about firearms and suicide alongside advice on safe gun storage so "controversial" that *Zauderer* does not apply.

Appellants also note that "[e]very plaintiff dealer strongly objected to the messages that the County's literature sends," pointing to purported "ideological implications" of the literature and arguing that "plaintiffs do not need a reason to object at all, other than that they do not wish to be subjected to compelled speech." MSI Br. 43-44.   But an entity's reluctance to comply does not make a required disclosure sufficiently "controversial" to escape *Zauderer* review.  By design,

disclosure requirements cause commercial speakers to provide "more information than they might otherwise be inclined to present." *Zauderer*, <u>471 U.S. at 650</u>. Appellants' approach would "allow[] challengers of a disclosure to bootstrap themselves out of the *Zauderer* exception and into strict scrutiny by creating their own controversy," Casey Adams, *A Compelling Case: Exploring the Law of Disclosures after NIFLA*, 82 U. Pitt. L. Rev. 353, 357 (2020). As such, it should be rejected.

### *Related to the commercial product*

The County's disclosures are sufficiently connected to the commercial product sold by firearms dealers to qualify for *Zauderer*'s standard of review. *See* County B<u>r. 20-22</u> (explaining that the ordinance regulates commercial speech). Appellants argue otherwise because firearms dealers "are not in the business of providing suicide or conflict resolution services." MSI B<u>r. 23</u>. But *Recht* demonstrates that the relevant question is not whether Appellants provide all of the services mentioned in the disclosure, but instead whether the required disclosure is reasonably related to the product or service being offered. There, fearing that attorney advertising for pharmaceutical claims could increase the risk that patients stop treatment, West Virginia required that such advertising state that individuals should "not stop taking a prescribed medication without first consulting with your doctor. Discontinuing a prescribed medication without your doctor's advice can

result in injury or death." *Recht*, <u>32 F.4th at 406</u> (internal quotation omitted).  Even though attorneys are not "in the business," MSI B<u>r. 23</u>, of giving people medical advice, this Court was not troubled by a law requiring them to tell individuals to consult with doctors to avoid harm.  While Appellants' logic would suggest attorneys could not be compelled to speak about services they do not directly provide, this Court upheld the disclosures in *Recht* after determining they furthered the state's interest by "providing information directly connected to the subject of the advertisement, rather than by compelling speech concerning unrelated or competing services."  *Id.* at 417.

The same is true here.  The County's required literature, by identifying a risk associated with access to firearms, "provide[s] information directly connected to the subject of the [sale]."  *Id.*  And the literature goes on to address the "very natural[] . . . follow-up question, 'How may I avoid that outcome?,'" *id.*, by providing factual and uncontroversial suggestions to reduce the risk that individuals use the purchased firearms to harm themselves or others.  As such, the County's requirement is subject to *Zauderer*'s rational basis review.

*Reasonably related to government interest*

The challenged disclosures easily meet *Zauderer*'s requirement of being "reasonably related" to its interest in protecting public health and safety.  *See* County B<u>r. 28-30</u>, <u>39-42</u>.  After the County's Gun Violence Prevention Task Force

16

submitted a report showing that firearms were used in 41 percent of suicides in the County, Anne Arundel County Report of the Gun Violence Prevention Task Force 24 (June 5, 2020), https://www.aacounty.org/boards-and-commissions/gun-violence-task-force/reports/fina-report-20200605.pdf, lawmakers took action and passed the disclosure requirement at issue to address this serious harm, JA789-90. As the court below explained, the "proven correlation between gun access and suicide risk" means that the County was effectively targeting its health warnings. JA1688. Because the disclosure requirements are reasonably related to the County's interest in protecting its residents, the First Amendment presents no obstacle to their enforcement.

## II.   Appellants' Interpretation of the First Amendment Would Threaten a Vast Array of Disclosure Laws.

To address potential harm from commercial products and services, lawmakers often turn to warning and disclosure requirements as a "light-touch way to achieve the government's goals of protecting public health, safety, and welfare." Andra Lim, Note, *Limiting NIFLA*, 72 Stan. L. Rev. 127, 129 (2020). Unlike regulations that "forbid or dictate the type of product that must be sold or the product that must be used," disclosure requirements "do not restrict conduct beyond requiring that certain information be provided." Stephen Breyer, *Regulation and Its Reform* 163 (1982). Such requirements do not "restrict individual choice as much as do the other classical forms of regulation" and "can be viewed as augmenting the preconditions of a

17

competitive marketplace" by securing consumer access to important information. *Id.* at 161.

The use of such disclosures across a wide variety of issue areas reflects that "people will perceive their own best interests if only they are well enough informed." *Virginia State Bd. of Pharmacy.,* 425 U.S. at 770. By giving individuals necessary information to make choices on how best to protect themselves and their families, disclosure laws further the principal justification for extending First Amendment protection to commercial speech: "the value to consumers of the information such speech provides." *Zauderer,* 471 U.S. at 651; *see also 44 Liquormart, Inc.,* 517 U.S. at 501 ("[R]equir[ing] the disclosure of beneficial consumer information . . . is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review."). Considering these benefits, it is no surprise that disclosure requirements of all stripes are ubiquitous at the federal, state, and local level.

**A.** The federal "[g]overnment has long required commercial disclosures to prevent consumer deception or to ensure consumer health or safety." *Am. Meat Inst.,* 760 F.3d at 31 (Kavanaugh, J., concurring in judgment). For example, the federal government has compelled the placement of health warnings on cigarette packaging since 1965. Pub. L. 89-92, 79 Stat. 282, 283 (July 27, 1965). It has set requirements for pharmaceutical labeling, including mandatory warnings and safety information,

since 1979. 44 Fed. Reg. 37,434 (June 26, 1979). It has required alcoholic beverage labels to warn pregnant women about potential birth defects and to inform all consumers about impaired driving ability and potential health problems from drinking for more than 30 years. Pub. L. 100-690, 102 Stat. 4181, 4219-20 (Nov. 18, 1988). And federal government mandates are behind the now-ubiquitous nutritional facts label on packaged food, Pub. L. 101-535, 104 Stat. 2353, 2353-57 (Nov. 8, 1990), and the calorie counts now found on chain restaurant menus, Pub. L. 111-148, 124 Stat. 119, 573-76 (Mar. 23, 2010).

Moreover, one need only enter an employee break room to understand that disclosure requirements about government rights and benefits are widespread. Required federal notices inform employees about their rights to a safe workplace, 29 U.S.C. § 657(c)(1), protections against discrimination, 42 U.S.C. § 2000e-10(a), reemployment rights if they leave for military service, 38 U.S.C. § 4334(a), and more. States impose an even wider variety of workplace disclosures. For example, Virginia employers must post information about federal and state earned income tax credits. Va. Code § 40.1-28.7:3. West Virginia requires hospitals to post information about the right of nurses to refuse mandatory overtime in certain circumstances. W. Va. Code § 21-5F-3(h). And Maryland requires employers to notify their employees about their rights to earned sick and safe leave. Md. Code, Lab. & Empl. § 3-1306.

19

Appellants' theory would place required disclosures like these at risk by limiting *Zauderer* to laws that require disclosures "as part of any advertising," MSI Br. 23, or "force a business to include speech that relates 'directly' to the speech otherwise voluntarily being undertaken by the business about a 'specific' service or product," *id.* at 28 (emphasis removed). Furthermore, Appellants' insistence that disclosures must be subject to strict scrutiny if they are tied to issues that regulated entities view as controversial could be used to render such routine notices unconstitutional. A business owner might, for example, take offense at a required sign informing workers about the federal minimum wage, 29 C.F.R. § 516.4, because she believes the minimum wage should not exist. Or she might find a required sign explaining how to report wage-and-hour violations, *see, e.g.,* Md. Code, Lab. & Empl. § 3-423, offensive because she might feel that it suggests that she is dishonest. Such disclosures are permitted by the First Amendment even if they provide information about policies with which some might disagree.

In addition, states and local governments use disclosure requirements for many reasons beyond just informing individuals of their legal rights. It is common to require warnings for consumers that a product could be dangerous. For example, some states require warning labels on marijuana products to inform consumers about potential health and safety risks. *See, e.g.,* Md. Code, Al. Bev. § 36-203.1(2)(ii) (requiring statement warning "that consumption of cannabis may impair your ability

20

to drive a car or operate machinery," "of potential risks associated with cannabis use, especially during pregnancy or breast feeding" and that users should "keep [the product] out of the reach of children and animals"). States often require businesses that sell alcohol to post signs warning about the risk of birth defects posed by consuming alcohol while pregnant. *See, e.g.,* W. Va. Code § 60-6-25. And some states use these alcohol warning signs to direct individuals to state agencies. 235 Ill. Comp. Stat. 5/6-24a (providing phone number for Office of Alcoholism and Substance Abuse); Utah Code § 32B-5-301 (providing phone number for Utah Department of Health). Likewise, states often require gambling establishments to post signs on-premises and include disclosures on advertisements that direct individuals to services that help compulsive and problem gamblers. *See, e.g.,* Md. Code Regs. § 36.03.06.03 (requiring gambling assistance message on signage and ads); W. Va. Code § 29-22B-907 (requiring hotline number on electronic gaming terminals). By subjecting to strict scrutiny disclosures providing information on "services offered by the [government] to advance the [government's] policy interests," MSI Br. 23, Appellants' view of *NIFLA* could put at risk all sorts of disclosures that inform people how to avoid harm from misusing products.

And the County's requirement that firearms dealers distribute state-produced or state-approved literature is also hardly unique. Florida, for example, requires health care providers who prescribe opioid pain medications to inform patients of

nonopioid alternatives and provide them with an "educational pamphlet" published by the state Department of Health outlining alternative medication and therapies. Fla. Stat. § 456.44(7). Myrtle Beach, South Carolina requires businesses that rent mopeds, scooters, low-speed vehicles, and golf carts to "provide a safety and operational brochure" designed by the local police department "to all operators" and to display a city-approved sign on the premises explaining certain rules. Myrtle Beach, S.C. Code of Ord. §§ 12-165, 12-169. And Montgomery County, Maryland passed an ordinance requiring retailers that sell pesticides to make available to buyers "materials approved or distributed" by the local Department of Environmental Protection that "explain the dangers of contamination that may occur from pesticide use" and "inform buyers of the availability of alternative products." Montgomery Cnty. Md. Code § 33B-3. The legislation also requires pesticide applicators to give their clients a written notice "prepared by the Department" providing contact information for government agencies and "a list of general safety precautions a customer should take when a lawn is treated with a pesticide." *Id.* § 33B-8.

State disclosure requirements often do more than just warn people about potential harm from a product. Like the County's challenged literature, they also share best practices about how consumers can avoid such harm. For example, Wisconsin requires retailers selling certain pesticides to provide customers

information sheets with information on how to safely use the product.  Wis. Admin. Code ATCP § 29.41(3)(b).  And Virginia requires petting zoos to post notices explaining "necessary sanitary precautions" for visitors to avoid pathogens.  Va. Code § 3.2-6403(D).

Appellants condemn the County's disclosure requirements as "discriminatory, underinclusive mandates."  MSI Br. 33.  But the *Zauderer* Court was "unpersuaded" by the "argument that a disclosure requirement is subject to attack if it is 'under-inclusive,'" noting that "governments are entitled to attack problems piecemeal." 471 U.S. at 651 n.14.  As the above examples show, allowing more focused legislation enables lawmakers to make judgments about the locations at which disclosures will most effectively further the public interest.  For example, many states have enacted laws requiring certain establishments to post signs warning about the danger of human trafficking and providing resources to victims or witnesses. *See, e.g.*, S.C. Code § 16-3-2100; N.C. Gen. Stat. §§ 14.202.13, 18B-1003, 19-8.4, 131E-84.1, 143B-348, 143B-431.3; Md. Code, Bus. Reg. § 19-103.  These requirements vary widely in scope.  Virginia has chosen to require postings of signs including a hotline number at adult entertainment venues, truck stops, and certain medical facilities, Va. Code § 40.1-11.3; 32.1-133.1, while West Virginia's mandate extends further to businesses including those permitting on-premises alcohol consumption, airports, bus stations, locations where certain farm laborers work, and

hotels, W.V. Code § 15A-2-5.

Appellants' interpretation of the First Amendment would place these and many more targeted requirements at risk, encouraging judicial micromanaging of elected officials' disclosure rules by simultaneously requiring statutes to be "narrowly tailored" to survive strict scrutiny, but using "underinclusive mandates" as evidence of unlawful motives.

**B.** Even when it comes to firearms-related disclosure requirements, the County's challenged ordinance is far from unique. Governments commonly require firearms dealers to share information to help reduce the risk of harm from the misuse of firearms. For more than two decades, the federal government has required federally licensed dealers to provide handgun buyers with a "written notification" stating that "[t]he misuse of handguns is a leading contributor to juvenile violence and fatalities," explaining that safe firearm storage will "help prevent the unlawful possession of handguns by juveniles, stop accidents, and save lives," and providing details about federal law regarding minors and handguns. 27 C.F.R. § 478.103. Dealers must also post a required sign on the premises with this information. *Id.*

And many states impose their own disclosure requirements on firearms dealers. Roughly one-third of states require dealers to warn gun purchasers about storing guns where children can access them. Gifford Law Center, *Gun Dealers*, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/gun-dealers/ (last

accessed July 12, 2023); *see, e.g.,* N.C. Gen. Stat. § 14-315.2 (requiring dealers to post warning that "IT IS UNLAWFUL TO STORE OR LEAVE A FIREARM THAT CAN BE DISCHARGED IN A MANNER THAT A REASONABLE PERSON SHOULD KNOW IS ACCESSIBLE TO A MINOR" and to give firearm purchasers a copy of state law on firearm storage). Maine requires dealers to "[i]nclude a basic firearm safety brochure with every firearm sold at retail in this State." Me. Rev. Stat. tit. 25 § 2012. This brochure must include information such as "[r]ules for safe handling, storage, and use of firearms" and "responsibilities of firearm ownership." *Id.*

Some statewide disclosure requirements also directly address firearms and suicide prevention. For example, Massachusetts has for nearly a decade required firearms dealers to "conspicuously post and distribute at each purchase counter a notice providing information on suicide prevention developed and provided by" the state Department of Public Health. Mass. Stat. 140 § 123. And Washington requires that dealers provide purchasers of certain firearms a state-written pamphlet on "the legal limits of the use of firearms and firearms safety," Wash. Rev. Code § 9.41.090; Wash. Session Law 1143-S2 (Apr. 14, 2023) (extending disclosures to buyers of all types of firearms effective January 1, 2024). This pamphlet is required by law to "incorporate information on suicide awareness and prevention," Wash. Rev. Code § 9.41.310, and includes numerous recommendations on how to prevent suicides,

Wash. Dep't of Fish & Wildlife, *Firearms Safety, Suicide Awareness, The Law, and You*, http://wdfw.wa.gov/publications/01492 (revised Oct. 31, 2022).

* * *

By attempting to limit "the reach of *Zauderer* to its facts" to impose strict scrutiny on the County's required pamphlets at firearms dealers, MSI Br. 17, Appellants ask this Court to endorse a vision of the First Amendment that could render unconstitutional a wide swath of common disclosure requirements. But as the Supreme Court recognized in *NIFLA*, the Constitution does not forbid government-mandated "health and safety warnings" or "purely factual and uncontroversial disclosures about commercial products." 138 S. Ct. at 2376. This Court should reject Appellants' efforts to prevent lawmakers from empowering consumers to make fully-informed decisions that protect themselves and their families.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
J. Alexander Rowell
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: July 14, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because it contains 5,948 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that the attached *amicus curiae* brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 14-point Times New Roman font.

Executed this 14th day of July, 2023.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on July 14, 2023.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 14th day of July, 2023.

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

2A