# No. 23-1351

# United States Court of Appeals

## *for the*

# Fourth Circuit

MARYLAND SHALL ISSUE, INC., *et al.*,

*Plaintiffs-Appellants,*

– v. –

ANNE ARUNDEL COUNTY, MARYLAND

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND, NO. 22-CV-865 (Gallagher, J.)

## BRIEF OF DOROTHY PAUGH, GWENDOLYN LA CROIX, CHERYL BROOKS, DON BAUGHAN, AND PATTI BROCKINGTON AS AMICI CURIAE IN SUPPORT OF APPELLEE AND AFFIRMANCE

ANDREW R. DUNLAP
VIVEK V. TATA
T. LIAM MURPHY
EMMA C. HOLLAND
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000
adunlap@selendygay.com
vtata@selendygay.com
lmurphy@selendygay.com
eholland@selendygay.com

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1351__     Caption: __Maryland Shall Issue, Inc., et al., v. Anne Arundel County, Maryland__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Dorothy Paugh, Gwendolyn La Croix, Cheryl Brooks, Don Baughan, Patti Brockington__
(name of party/amicus)

_____

 who are _____Amici Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?  ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)     ☐YES☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?     ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?     ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Andrew R. Dunlap       Date:    July 17, 2023

Counsel for: Amici Curiae

Print to PDF for Filing

# **TABLE OF CONTENTS**

**Pages**

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE ............................................................................... 1

INTRODUCTION ....................................................................... 1

THE DEVASTATING IMPACT OF FIREARM SUICIDE ...................... 3

I.    Dorothy Paugh Loses Her Father, Then Her Son ......................... 3

II.   Gwendolyn La Croix Loses Her 17-Year-Old Son........................ 7

III.  Cheryl Brooks and Don Baughan Lose Their Son ....................... 12

IV.   Patti Brockington Survives Her Suicide ......................... 15

CONCLUSION ....................................................................... 19

i

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

Family members of *amici* Dorothy Paugh, Gwendolyn La Croix, Cheryl Brooks, and Don Baughan died by firearm suicide. *Amicus* Patti Brockington attempted firearm suicide but survived. They write to share their experiences with the Court as it considers Anne Arundel County's ordinance (the "Ordinance") requiring that gun buyers be provided with information about the risk factors for suicide by firearm at the time of purchase.

All parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money intended to fund the preparation or submission of this brief. No person, other than *amici curiae* or their counsel, contributed money intended to fund the preparation or submission of this brief.

## INTRODUCTION

If someone has access to firearms, there is an increased risk that they will die by suicide—one out of every two Americans who die by suicide uses a gun to do so. JA0795–797. Someone is also more likely to die by suicide if they have depression or bipolar disorder, have a family history of suicide, or suffered childhood abuse or trauma. *Id.* Anne Arundel

County requires stores that sell guns or ammunition to provide customers with literature (the "Pamphlet"), JA0791–800, that explains these risk factors, provides tips on secure storage, and lists mental health resources for those contemplating suicide. *Id.*

In this brief, *amici* tell the stories of five people who had access to guns, struggled with depression or trauma, and either used a firearm to end their lives or attempted to do so. Dorothy Paugh lost her father Edwin and her son Peter. Gwendolyn La Croix lost her son Jonah. Cheryl Brooks and Don Baughan lost their son Michael. Patti Brockington would have died by suicide if her family had not taken her gun from her house.

*Amici* strongly believe that information and resources about firearm suicide, such as the literature required by the Ordinance, could have prevented the deaths by suicide and the suicide attempt described in this brief, and could save the lives of others at risk. They support laws like Anne Arundel's Ordinance that provide this vital information at the time of sale.

## THE DEVASTATING IMPACT OF FIREARM SUICIDE

### I.   Dorothy Paugh Loses Her Father, Then Her Son

When she was a child, Dorothy Paugh's father Edwin killed himself with a handgun. Nearly fifty years later, her son Peter did the same.

Dorothy remembers Edwin as "stern," "the strong, silent type." His mother and father died when he was young. Orphaned, he was raised apart from his brothers. During World War II, he served as an Army master sergeant in Myanmar (then called Burma). He never spoke about his childhood or his military service; he kept his "turmoil" bottled up inside. As Dorothy puts it, Edwin carried "an invisible wound."

After the war, he worked on an Army post in Aberdeen, Maryland, where he raised Dorothy and her four siblings. In the summer of 1965, Edwin lost his job. A few days later, he sent his wife and children to a swimming pool on the post. He went to the basement of their home, where he used a handgun to kill himself. Edwin had calculated that his life insurance would pay out enough to support his wife in raising their children. He left a short note that said: "I'm sorry" and "God, forgive me."

Dorothy remembers the "carefree joy" of a hot summer day at the pool being "shattered by numbness, confusion, shock, grief, and shame." Her mother's name was announced over the pool loudspeaker. Military

police took the family to the post clinic, where their priest told them that Edwin had died—and how. Dorothy was nine.

Edwin's death affected his family "immensely." They lost their "sense of security and stability." Dorothy felt a sense of shame and abandonment. As she grew older, she thought of killing herself, but vowed against it because of her family's experience.

Inspired by her father's service, Dorothy joined the Navy after graduating from college. She served in Florida, Utah, Maryland, and Rhode Island, worked at the Pentagon, and earned a master's degree in National Security and Strategic Studies. After 16 years, Dorothy retired from the Navy to put down roots in Maryland.

Peter, the second of Dorothy's three sons, was born in 1986. He was "very witty," independent, and responsible. Even after she told them that they had to cut spending, Peter's brothers kept adding cookies and potato chips to their shopping cart. Not Peter. He took things out, to help save money. After the family moved to Rhode Island, Peter came into the house, covered in dirt, holding potatoes he had dug up with his brothers, saying, "Mom, there's nothing to worry about. There's plenty of food here."

Peter found joy in the outdoors, especially the small corners that others ignored. When asked in college to write about a place in nature that awed him, Peter wrote about a graffiti-covered culvert three blocks from his family's house where he would escape to the woods and watch crayfish in a stream. "The stream," he wrote, "was where the sound of flowing water could quiet the din of everything else." Peter followed this love to a job with the United States Geological Survey. He and his girl-friend bought a house and moved in together.

But there were signs that Peter was unhappy. At work, he was transferred from testing groundwater, which he loved, to working in IT, which he disliked. When a few family members celebrated salary raises, Peter remarked that he was not worth as much. Looking back, Dorothy thinks she saw "a flash of something in his eye" that something was wrong.

Something was. One day in 2012, Dorothy was sitting at her desk at work when a police officer called. The officer asked: "Why would he do this?" She had no idea what he meant. She asked: "Why would he do what?" The officer said: "Shoot himself."

Peter had killed himself. He had written notes to Dorothy and to his fiancée apologizing and saying that "life seems like too much of a burden," walked into the woods near his house to where two trees formed an arch by a stream, and called the police to let them know what he was about to do. The officers arrived in time to hear the gunshot. Peter had put on a bright orange shirt so they could easily find his body in the dense brush. He did not want others to stumble upon his body or his gun. Peter had put his driver's license on the ground next to him, to show that he was an organ donor.

Peter's death caused Dorothy's "whole world to shatter." She would wake up in the morning and, for a moment, forget that her son was gone. Then she would remember, and her reality would "come crashing in."

Peter bought the handgun he used to end his life ten months earlier at a Bass Pro Shop in Anne Arundel County. This was before Anne Arundel passed the Ordinance, requiring that gun buyers be told the risk factors for suicide, which include access to firearms. "What if Peter had been given a suicide prevention brochure when he bought his gun?" Dorothy asks. What if, years earlier, Edwin had been given one when he bought a handgun the day before he killed himself? "Perhaps if he had

seen a sign in the gun shop that said real men can and do ask for help, he might have reached out for it, and left a far better example for my son to follow."

Dorothy is not afraid of guns. A veteran, she knows how to use them. But she recognizes that "the gun seller and the manufacturer have a vested interest in telling you what a gun is good for." The government, in contrast, has an interest in telling buyers "the whole story," including the risk factors for firearm suicide. Dorothy believes that the Pamphlet does that.

It is critical, Dorothy says, for gun owners to know that when someone is in crisis, guns must be as far away as possible, to reduce the risk of suicide by firearm. This is a danger that many people do not want to discuss—Dorothy's family never discussed Edwin's death out of shame. But Dorothy wants everyone to know. "I want to communicate the risks and the steps that can be taken," she says. "As uncomfortable as it is, it's far less uncomfortable than a funeral."

## II.    Gwendolyn La Croix Loses Her 17-Year-Old Son

A month after his 17th birthday, Gwendolyn La Croix's son Jonah shot himself in the head with a handgun that he found in a drawer.

As a teenager, Jonah was a "big teddy bear," who doted on his three younger brothers. But he had struggled with mental illness since childhood. He had explosive outbursts, growing angry and even running out of school. At seven, he had said that he wanted to stab himself, leading his parents to rush him to the hospital. He was diagnosed with bipolar disorder.

Jonah started taking medication. "The medication," Gwendolyn says, "changed the game for him." His emotions stabilized. After two years, Jonah's doctors tried weaning him off the drugs. A month later, Jonah became "manic." Gwendolyn took him to an institution for help, and he was put back on his medication.

As a teenager, Jonah seemed to be doing better. He was in his high school's National Honor Society. While in high school, he enrolled in an early college program at Eastern Michigan University, so he could earn credits that would help him graduate college early, leaving more money to send his brothers to college. He wanted to study philosophy, joking with Gwendolyn that he would spend his life hanging out in Parisian cafes. Jonah was, Gwendolyn says, "extremely smart and extremely stubborn."

But Jonah still struggled, especially with anger. One day, while they were driving, Gwendolyn asked Jonah how he had used money that she had given him for school supplies. When he answered, she asked if he was lying. Jonah grew very upset, saying: "I lie to you all the time. I feel like you know I'm having bad thoughts." Gwendolyn said that she was worried and was going to drive him to the hospital. Wanting out, Jonah jumped from the moving car and ended up in the hospital anyway. Luckily, he was not badly hurt.

The next morning, Jonah's psychiatrist assessed that Jonah did not have genuine suicidal thoughts. Gwendolyn says: "We just thought it was a matter of being upset. His anger would flare up and we thought it was the impulsivity that goes with being seventeen."

It wasn't. A month later, Gwendolyn and Jonah had a lighthearted debate over an episode of Saturday Night Live. It grew heated—then violent. After Gwendolyn took his phone, Jonah came to his mother's bedroom with a hunting knife and lunged at her. Gwendolyn tried to shut the door, but Jonah kept coming. He stabbed his mother in the arm.

Gwendolyn decided not to call the police, or even an ambulance, because she did not want Jonah to get in trouble. She instead left for the hospital with her other sons and her mother-in-law.

Usually, when Jonah got upset, he would walk outside for twenty minutes, then come back home and apologize. "He'd come back and say, 'I'm sorry Mom,' and I'd say sorry too." Gwendolyn thought the same thing would happen now. At the hospital, she sent her mother-in-law back to the house to check on Jonah and bring him to the hospital. They did not come.

From the hospital, Gwendolyn called her husband. She asked: "How are you?" He said: "I'm okay." She asked: "How's Jonah?" He said: "Not okay." At that moment, Gwendolyn says, "I knew." Jonah had killed himself. Gwendolyn's mother-in-law had found him in a hallway on the main floor of the house.

When she was first told, Gwendolyn thought Jonah had used the hunting knife, but she was wrong. Jonah had shot himself. Gwendolyn's then-husband, who saw himself as a gun collector, usually kept his guns locked in the basement. But Gwendolyn would sometimes find unsecured guns in their living areas and would confront him about it. Jonah had

found the gun that he used to end his life in an unlocked drawer that the family used to keep spare batteries. "I think finding the gun is what made him do it," Gwendolyn reflects.

As she planned her son's funeral, Gwendolyn was numb. It was a "terrible, wonderful party." Two-hundred-fifty people came. The entire football team from Jonah's school attended, telling Gwendolyn that they would not have passed math without Jonah's tutoring. Pastors spoke about Jonah's thoughtful questions on religion and recounted how Jonah would help them break up fights between other kids. "I wish," Gwendolyn says, "he could have heard it all when he was alive."

Today, Gwendolyn works as a psychiatric nurse practitioner. She sees more than forty patients a day who are struggling with mental health and suicidal ideation. She has also advocated for secure storage laws in Michigan. Her work, Gwendolyn says, requires her to "tell the story of the worst day of my life over and over again." But she keeps on, to ensure that "Jonah's life meant something."

Gwendolyn believes that gun buyers need to know the warning signs of suicide, to think about how guns are stored in houses with children, and to understand how to resolve conflicts when guns are nearby.

11

She compares the Pamphlet to nutritional information on a box of cupcakes: "They have to tell you, 'It's this many grams of sugar' . . . I think it's necessary information for people who own a gun to have."

## III.  Cheryl Brooks and Don Baughan Lose Their Son

In 2014, Cheryl Brooks and Don Baughan's oldest son, Michael Baughan, killed himself with a gun he bought at Walmart.

Cheryl and Don raised Michael in Carroll County, Maryland. He was bright. Because Michael did not speak until he was three, his elementary school initially thought that he had learning disabilities. But the summer before first grade, a librarian found that he was actually reading three years above grade level. He was promoted from a special education class to a gifted-and-talented program.

Michael pushed himself to get good grades. 99 out of 100, Cheryl recalls, "was not good enough" for him. He loved video games and computers, eventually building a computer himself. He also loved nature, and, for a time, Boy Scouts. He became involved with theater. And from childhood, Michael had a group of close friends.

But Michael struggled with depression. In fifth grade, in a class without his friends for the first time, he would come home, retreat under

his covers, and say that he wished he were dead. Cheryl took Michael to a therapist, who assured her that Michael's thoughts and behavior were normal signs of puberty.

In high school, after a bad breakup, Michael began writing poems that expressed sadness and a loss of hope. His parents were concerned and took him to a psychiatrist. Michael signed a contract saying that he would not hurt himself. He was prescribed Prozac, but never took it— Cheryl found the pills in the trash.

As an adult, Michael became increasingly isolated. He attended nearby Salisbury University to be close to his friends, and he excelled. After graduating, however, he took a job as a contractor for DuPont in Wilmington, away from his friends and family. He began to fall out of touch with his old friends, especially as they married and had children. He had trouble making new friends. He grew frustrated with his job. And he spent more and more time alone. Michael never spoke about his depression, Cheryl says; he kept it bottled up.

On the evening of June 13, 2013, Michael called Cheryl. He said: "Mom, I went to Walmart and bought a gun in less than fifteen minutes." He was in the bathtub, with the gun in his mouth. Cheryl's years of

training as a psychiatric nurse "went out the door. This was my son, and all my attention in that moment was on simply trying to save him." She didn't understand: "Why would he do something so violent?"

Michael did not use the gun that night. Cheryl and Don went to Wilmington. They asked him to give them the gun. He refused. He lived in an unsafe area, he said, and wanted it for self-protection. Cheryl and Don had no legal right to take the gun away.

Michael spent that Christmas with his parents. During the holidays, Cheryl asked her family to pose for a picture. She figured that Michael would be reluctant to join because he did not like being photographed. But just before he left, Michael reminded his mother of her request and he posed with his family for a photograph outside his parents' house. Cheryl recalls "a gut feeling that something was wrong."

Early on the morning after Valentine's Day in 2014, Cheryl and Don woke up to banging at their front door. It was the Maryland State police. Michael had shot himself, they said. He was 30 years old.

For the next year, Cheryl was in shock. She felt isolated. "People expect you to get over it," Cheryl says, "but it leaves a scar." Cheryl began listening to the stories of others who had lost family members to gun

14

violence. At one meeting, a survivor gave her a bracelet that said: "I wish he would have hugged me instead of that gun." That day, Cheryl began working as a survivor's advocate. She says: "It was a way for me to turn all this grief into something more powerful."

Cheryl believes that giving gun buyers information like that in the Pamphlet will save lives. When Michael bought the gun that he used to end his life, he was suffering from long-term, chronic depression. No one gave him any information about the risk factors for suicide by firearm. Cheryl wonders what kind of life Michael would be living if he had received that information. "We can't bring Michael back," she says, "but with this pamphlet, another life could be saved."

## IV. Patti Brockington Survives Her Suicide

One morning in 1986, feeling hopeless and alone, Patti Brockington decided to end her life with a handgun that she kept in her closet.

Patti did not make this decision lightly. Growing up, she had often been sexually harassed in her Dallas neighborhood, but her parents brushed it off each time. In high school, she was sexually assaulted, but never told her parents, because she did not think they would believe her.

15

As a young adult, Patti struggled with broken relationships, financial hardship, and addiction. Soon after high school, she met her first husband, an older man who abused drugs. They divorced within six months, leaving Patti to care for their newborn daughter alone. A second marriage also failed, leaving Patti with a second daughter. With few options, Patti moved back home.

Although she was deeply depressed, Patti's family dismissed her mental health issues. Feeling hopeless and alone, Patti tried to end her life by overdosing on sleeping pills. As she now recognizes, this was a plea for help: "Just, you know, how can somebody help me?" It went unanswered: "It didn't work, I just had to figure things out on my own."

Patti began bartending to make ends meet. But easy access to alcohol led to alcohol abuse, which exacerbated her depression. As things got worse, her parents and siblings finally tried to intervene, especially to help her daughters. But Patti did not want their help. She recalls thinking: "You know, I've got a job. … I'm supporting these kids. I can drink like I want to. Mind your own business." Patti's family began withdrawing from her life.

16

In 1982, a stranger broke into Patti's house and violently raped her at knifepoint. The assault shattered her already suffering mental health. After that night, Patti constantly felt unsafe and paranoid.

That's when she bought a gun. Her brother suggested that owning a firearm might calm her fears. He took her to a flea market gun store outside of Dallas, where she bought a Ruger firearm and ammunition. "I had never shot a gun before in my life," Patti recalls. "I shot it twice into the ground and I never touched the gun again because I was scared of guns." She left the gun in a closet, unsecured.

Four years later, Patti decided to use that gun to kill herself. "I was so hopeless," she recalls. "Nothing else had ever worked. This was going to work. … The gun was a permanent solution to a very bad day." Patti went to the closet—but the gun was gone. Someone had removed it, saving her life.

Things got worse, then better. Patti's then-partner, a "good man" who helped care for her children, overdosed on heroin. His death sparked Patti to get sober, and she began turning her life around. She now takes depression medication and receives counseling.

In 2018, while listening to the stories of survivors of gun violence, Patti had an epiphany: "I am a survivor. I am truly a survivor of my own suicide. Had that gun been there, I would have shot myself. I'm just positive of that."

Patti believes that if, in 1982, she had been given information like that in the Anne Arundel Pamphlet, she might not have attempted suicide during her mental health crisis. Aware of the risk factors, she might have sought to secure or temporarily remove the firearm from her home, thinking, "maybe it's not such a good idea for me to have a gun." She might have reached out for help—for example, by calling a suicide hotline. Or her brother, with her at the time of purchase, might have urged her to seek help and temporarily remove the gun from her home.

"If you have a loved one who is in a mental health crisis," Patti says, "you would never put a weapon in front of them. Because they could be a danger to themselves or others." She strongly supports laws like the one at issue, requiring that gun buyers receive accurate information about the risks of suicide by firearm. "You never know whose life you're saving," Patti says. "Would it hurt to put some information in there? It could possibly save people's lives."

18

## <u>CONCLUSION</u>

This brief describes the worst days of *amici's* lives. Their wrenching experiences have led them to believe that other suicides could be prevented if gun buyers are warned about suicide risk factors, told how to securely store guns, and given mental health resources. They strongly support Anne Arundel County's efforts to do so. *Amici* urge this Court to affirm the judgment of the district court.

July 17, 2023                     Respectfully submitted,

                              /s/   *Andrew R. Dunlap*
                              Andrew R. Dunlap
                              Vivek V. Tata
                              T. Liam Murphy
                              Emma C. Holland
                              SELENDY GAY ELSBERG PLLC
                              1290 Avenue of the Americas
                              New York, NY 10104
                              Tel: 212-390-9000
                              adunlap@selendygay.com
                              vtata@selendygay.com
                              lmurphy@selendygay.com
                              eholland@selendygay.com

                              *Counsel for Amici Curiae Dorothy*
                              *Paugh, Gwendolyn La Croix, Cheryl*
                              *Brooks, Don Baughan, and Patti*
                              *Brockington*

19

## <u>CERTIFICATE OF COMPLIANCE</u>

Under Federal Rule of Appellate Procedure 29(a)(4)(G), I certify that:

This brief complies with Rule 29(a)(5)'s type-volume limitation because it contains 3,832 words, as determined by the Microsoft Word word-processing system used to prepare the brief, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

July 17, 2023                          /s/    *Andrew R. Dunlap*
                                                    Andrew R. Dunlap

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused this document to be electronically filed with the Clerk of the Court using the appellate CM/ECF system on July 17, 2023. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

July 17, 2023                    /s/     *Andrew R. Dunlap*
                                         Andrew R. Dunlap